747 A.2d 677

**Victor G. RIEMER et al.**

v.

**COLUMBIA MEDICAL PLAN, INC.**

**No. 90, Sept. Term, 1999.**

Court of Appeals of Maryland.

March 10, 2000.

224

F. Paul Bland, Jr. of Trial Lawyers for Public Justice, Washington, DC (Bruce M. Plaxen of Plaxen & Adler, P.A., Columbia; Robert K. Jenner of Greenberg & Bederman, Silver Spring; Kieron F. Quinn of The Law Office of Kieron F. Quinn, Baltimore; and Bryant L. Welch of Bryant L. Welch, J.D., Ph.D. & Assoc., Potomac), all on brief, for appellants.

Ralph S. Tyler (George Beall and Maura L. DeMouy of Hogan & Hartson L.L.P., on brief), Baltimore, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

CATHELL, Judge.

Appellants, Victor G. Riemer, Stephen Marx, and Janet Marx, are subscribers (or members) of Columbia Medical Plan, Inc. (CMP),[1] appellee, a health maintenance organization (HMO). In their complaint, appellants allege that provisions in the contract between CMP and its members, which purport to give CMP the right to recover the cost of health care from third-party tortfeasors, are in direct violation of several provisions of the Maryland Health Maintenance Organization Act, Maryland Code (1982, 1996 Repl.Vol., 1999 Cum.Supp.), Title 19, subtitle 7, of the Health–General Article.[2]

This cause of action began with members of CMP receiving health care benefits from CMP for injuries arising out of accidents due to negligent third parties. In the instances described, the members received medical benefits from CMP, then later received financial settlements arising out of their accident claims from the third parties. CMP then sought reimbursement and/or subrogation recovery from the subscribers' proceeds of their settlements for the health care benefits it had provided. On April 3, 1995, appellant Victor Riemer received a sum of $10,000.00 to resolve a claim arising from an automobile accident. CMP asserted a lien against this recovery, and Mr. Riemer paid $829.50 to CMP on June 20, 1995. Similarly, appellants Stephen and Janet Marx received $18,000.00 to settle their tort claims arising from a car accident involving their son, and CMP asserted a lien against this recovery in excess of $2,600.00.

---

1. While this case has been pending, members of CMP became members of Free State Health Plan, Inc. In this opinion, we will refer to the appellees as members of the HMO under which this action was filed, CMP.

2. All reference, *infra,* to sections in the Health–General Article refer to the 1996 Replacement Volume or 1999 Cumulative Supplement, unless otherwise stated.

On July 15, 1996, appellants, on their own behalf and on the behalf of a putative class of similarly situated persons, filed a complaint in the Circuit Court for Howard County against appellee. In their complaint, appellants allege that appellee's general policy of pursuing its members for subrogation whenever they recover funds from a third party in a tort action is illegal and improper under sections 19–701(f)(3) and 19–710(o) of the Health–General Article. They brought three causes of action: unjust enrichment/money had and received; negligent misrepresentation; and a request for a declaratory judgment that appellee breached its contractual, statutory, and common law obligations to appellants by claiming improperly a subrogation interest in and a lien against third-party settlement recoveries by appellants.

On August 15, 1996, appellee removed this case to the United States District Court for the District of Maryland. Appellee contended that appellants' state law challenges to the CMP plan provisions were preempted by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq. (1994 & Supp.1998), and that the provisions of the Maryland HMO Act were thus void and without effect. On December 24, 1997, the federal court held that the CMP plan provisions were preempted with respect to all persons who were members of CMP by virtue of employee benefit plans governed by the ERISA. However, the court also held that there was no federal jurisdiction over those class members who were not members of the CMP through an ERISA health plan, and remanded their claims to the Circuit Court for Howard County.[3]

Upon remand, appellee moved for the circuit court to stay all proceedings pending the outcome of the federal appeal dealing with the ERISA preemption. The circuit court denied the motion. Both parties then moved for summary judgment.

---

**3.** Appellee appealed this decision to the United States Court of Appeals for the Fourth Circuit. The case was argued before the Fourth Circuit on January 25, 1999. As of the filing of this opinion, the Fourth Circuit has not issued its decision.

On March 24, 1999, the circuit court granted appellee's motion for summary judgment on all claims. Appellants appealed to the Court of Special Appeals. On our own initiative, we granted review prior to argument in the Court of Special Appeals. Appellant presents three issues to this Court:

I. Did the circuit court err by holding that the [appellee] HMO was permitted to pursue its members for compensation after they received a payment from a third party tortfeasor, when Md.Code Ann., Health–Gen. § 19–701(f)(3) expressly forbids HMO's from receiving any compensation except for premiums, deductibles or co-payments.

II. Did the circuit court err by holding that the [appellee] HMO was permitted to pursue its members for "subrogation," which is the right to recover monies spent to pay the debt of another, when Md.Code Ann., Health–Gen. § 19–710(o) provides that HMO members owe no money (and thus have no debt) for covered medical care that they receive from the HMO?

III. Did the circuit court err by finding that interpreting §§ 19–701(f)(3) and 19–710(o) to mean what they say would be "illogical, unreasonable, and inconsistent with common sense," because interpreting those provisions to mean what they say would contradict the circuit court's own policy preferences?

## II. History of HMOs

In order to address the issues presented in the case *sub judice,* we must first establish a basic definition of a health maintenance organization (HMO). The Court of Special Appeals took great lengths in defining an HMO in *Patel v. HealthPlus, Inc.,* 112 Md.App. 251, 258–60, 684 A.2d 904, 908–09 (1996): [4]

---

4. The origins of the modern day HMO can be traced to the turn of the twentieth century but such plans were relatively uncommon until the 1930s when they were created in response to health care needs during the Great Depression. Still, HMOs did not hit the forefront of the medical community until the latter part of the twentieth century.

HMO is a generic term for prepaid health coverage plans that provide medical services to a relatively large population at a fixed rate. There are five salient characteristics of HMOs.

1) HMOs assume the contractual responsibilities for providing health care services to subscribers (subscribers and members are used interchangeably).

2) HMOs are closed health care systems, providing services only to a defined and enrolled clientele.

3) Members are voluntarily enrolled.

4) Payment [by the members] for care is fixed and periodic.

5) HMOs assume financial risk, which may level either to a loss or a gain.

Health Maintenance Organization[s], [An ] Analysis of the HMO Industry in Maryland, Research Division, Department of Legislative Reference, Legislative Report Service, November 1986.

There are several models of HMOs in respect to the manner of providing health services to members. They include generally: (1) Staff Models—the HMO employs salaried health care professionals to provide health care services; (2) Group Practice Model—the HMO contracts with a private practice group to provide health services to members; (3) Independent Practice Association—physicians create the HMO as an association of physicians or individual physicians to provide health care to members usually on a fee for service basis (the fees are fixed and the individual physician bears the risk of loss if the cost of the service exceeds the fee schedule) but sometimes on a capitation

---

President Richard M. Nixon's endorsement of HMOs as a way of controlling health care costs in a message to Congress on February 18, 1971, led to the Federal HMO Act of 1973. The State of Maryland followed shortly thereafter with the enacting of the Health Maintenance Organization Act of 1975. See generally Health Maintenance Organizations: An Analysis of the HMO Industry in Maryland, Department of Legislative Reference (Nov.1986). In the 1980s, HMOs began dominating the medical service industry.

basis (a fee of X amount per applicable member of the HMO); and (4) Network Model—the HMO contracts with one or more physicians or group practices.

Shickich defines [an] HMO as " 'an organization which brings together a comprehensive range of medical services in a single organization.' " Barbara A. Shickich, *Legal Characteristics of the Health Maintenance Organization, in Healthcare Facilities Law* § 16.4 (Anne M. Dellinger ed., 1991) (footnote and citation omitted). She describes three characteristics of [an] HMO:

(1) It is an organized system for the delivery of health care which brings together health care providers.

(2) Such an arrangement makes available basic health care which the enrolled group [the members or subscribers] might reasonably require....

(3) The payments [to the HMO] will be made on a prepayment basis, whether by the individual enrollee[ ] ... [or in his behalf by others, *i.e.*, employers].

*Id.* (footnote omitted).

As Shickich notes, [an] HMO is a vertical system of health care that brings together the providers, *i.e.*, the physicians, dentists, etc., who provide medical services, and the subscribers, *i.e.*, the members of the HMO or HMOs, who receive the medical services. [An] HMO is a facilitator. It arranges for medical services. In doing so, it enters into two or more basic contractual relationships. First, it agrees (contracts) to provide medical services, either through its employee physicians or through providers under other contracts, to its subscribers for a fixed fee which is paid by the subscribers to the HMO. The HMO then ... enters into a separate contract or contracts with physicians (or dentists, etc.) for the physicians to provide the medical services the HMO has agreed to provide to its members under their separate subscriber contracts. Apparently, it is through its bulk buying power, *i.e.*, its power to direct its members, that it is able to procure medical services at or below otherwise prevailing rates. Additionally, it is presumed, by at least

"for-profit" HMOs, that large numbers of subscribers will not need medical services or that the medical services provided to subscribers will cost less than the membership fees received. [Footnotes omitted.]

 An HMO thus can be described as "an organization that contracts to produce or to arrange to buy a specific list of health services for a specified population of members in exchange for a specified sum per person, paid periodically in advance." Alan Somers, *What You and Your Physician Client Need to Know About Managed Care Contracts,* Prac. Law., Apr. 1996, at 22. These basic descriptions are important as an HMO is defined in great part by the nature of how it receives compensation, which is at the heart of the case *sub judice.*

## III. Discussion

 Appellee asserts that the payments at issue here constitute subrogation, which has been defined as "[t]he substitution of one person in the place of another with reference to a lawful claim, demand or right, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities." *Black's Law Dictionary* 1427 (6th ed.1990). As this Court has said:

> Subrogation is founded upon the equitable powers of the court. It is intended to provide relief against loss and damage to a meritorious creditor who has paid the debt of another. *Milholland v. Tiffany,* 64 Md. 455, 460, 2 A. 831 (1886). The doctrine is a legal fiction whereby an obligation extinguished by a payment made by a third person is treated as still subsisting for the benefit of this third person. *Harford Bank v. Hopper's Estate,* 169 Md. 314, 324, 181 A. 751 (1935) (citing *Aetna Life Ins. Co. v. Middleport,* 124 U.S. 534, 8 S.Ct. 625, 31 L.Ed. 537 (1888)). This third person succeeds to the rights of the creditor in relation to the debt. *Finance Co. of Am. v. U.S.F. & G. Co.,* 277 Md. 177, 182, 353 A.2d 249 (1976) (and cases cited therein); [*George L.] Schnader [, Jr., Inc. v. Cole Bldg. Co.*], 236 Md. [17,] 22, 202 A.2d 326 [, 330 (1964) ]. The rationale underly-

ing the doctrine of subrogation is to prevent the party primarily liable on the debt from being unjustly enriched when someone pays his debt. *Security Ins. Co. v. Mangan,* 250 Md. 241, 246–47, 242 A.2d 482 (1968). *See also* 10 S. Williston, *A Treatise on the Law of Contracts* § 1265 at 845 (W. Jaeger 3d ed.1967):

> "The object of subrogation is the prevention of injustice. It is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate payment of a debt by one, who, in justice, equity, and good conscience, should pay it. It is an appropriate means of preventing unjust enrichment. The doctrine of subrogation is applied to ... do equity in the particular case under consideration."

Since a person entitled to subrogation stands in the shoes of the creditor, he is ordinarily entitled to all the remedies of the creditor, and he may use all the means which the creditor could employ to enforce payment. *Poe v. Phila. Casualty Co.,* 118 Md. 347, 352–53, 84 A. 476 (1912). This means that a subrogee can enforce the obligation of a guarantor of the debtor.

*Bachmann v. Glazer,* 316 Md. 405, 412–13, 559 A.2d 365, 368–69 (1989).

Appellee makes these demands for restitution or subrogation compensation pursuant to the "Third Party Liability" provision of its subscribers policy, which, as relevant hereto, provides as follows:

> If a *member* is injured or becomes ill through an act of omission or commission of a third party, the *Plan* will provide care as for any other injury or illness. Acceptance of such services will constitute consent to the provisions of this section.

> If such *member* receives payment from such [a] third party, by suit or settlement, the *member* is obligated to reimburse the *Plan* for the reasonable cash value of the services and supplies provided under this *Health Benefits Certificate.*
> . . . .

The *member* must take such action, furnish such information and assistance, and execute such instruments as the *Plan* may require to facilitate enforcement of its rights under this provision. The *member* must agree to take no action prejudicing the rights and interests of the *Plan* under this provision.

If the Plan so decides, it may be subrogated to the *member's* right to the extent of the benefits received under this contract. This includes the *Plan's* right to bring suit against the third party in the *member's* name.

■ We hold that generally, pursuant to sections 19–701(f) and 19–710(b) and (*o*) of the Health–General Article, and the general statutory scheme of Maryland's Health Maintenance Organization Act, an HMO may not pursue its members for restitution, reimbursement, or subrogation after the members have received a financial settlement from a third-party tortfeasor, any contract to the contrary notwithstanding. Restitution, reimbursement, and subrogation provisions are contrary to the express wording of subtitle 7 of Title 19 of the Health–General Article. Moreover, they are in conflict with the basic nature of HMOs based on subscriber per fee services. Under the basic concept of HMOs, a subscriber has no further obligation, primary or otherwise, beyond his or her fee for health services provided.[5] Accordingly, there is, in any event, nothing for an HMO to be subrogated to. The subscriber is not a primary debtor. The HMO, as to the fees paid health care providers, i.e., doctors, hospitals, etc., is the primary debtor. We hold that the trial court erred on all three issues and accordingly, we reverse.

### A. Section 19–701(f)

Section 19–701(f) of the Health–General Article defines a health maintenance organization (HMO) as

---

**5.** There may be separate "co-payment" or "deductible" provisions provided for in the statutes. *See infra.*

any person, including a profit or nonprofit corporation organized under the laws of any state or country, that:

(1) Operates or proposes to operate in this State;

(2) Except as provided in § 19–703(b) and (f) of this subtitle, provides or otherwise makes available to its members health care services that include at least physician, hospitalization, laboratory, X-ray, emergency, and preventive services, out-of-area coverage, and any other health care services that the Commissioner determines to be available generally on an insured *or prepaid basis* in the area serviced by the health maintenance organization, and, at the option of the health maintenance organization, may provide additional coverage;

(3) Except for any copayment or deductible arrangement, is compensated *only* on a predetermined periodic rate basis for providing to members the minimum services that are specified in item (2) of this subsection.... [Emphasis added.]

Section 19–710(b) provides explicitly "the applicant [for a certificate to operate as an HMO] *shall* conform *to the definition* of a health maintenance organization." (Emphasis added.)

Section 19–712 ("Powers and authority of health maintenance organization.") provides in part:

[A] person who holds a certificate of authority to operate a health maintenance organization : ... may:

(3) Provide health care services on a *prepaid* basis.... [Emphasis added.]

Section 19–729 ("Prohibited acts; remedies."), provides that an HMO may not:

(1) Violate any provision of the subtitle ...

. . . .

(7) Fraudulently obtain ... any benefit under this subtitle;

(8) Fail to fulfill the basic requirements to operate as a health maintenance organization as provided in § 19–710 of this subtitle....

Section 19–710(b), as we have said, contains a requirement that HMOs conform to the definition of an HMO. Accordingly, the statutes, by their language, expressly require an HMO to limit its payments or money from subscribers to the fixed prepaid periodic fee or rate.

██ We commence our further analysis of section 19–701(f) by attempting to ascertain the intent of the Legislature. As we said in *State v. Bell,* 351 Md. 709, 717–19, 720 A.2d 311, 315–16 (1998):

> We have said that "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995). Legislative intent must be sought first in the actual language of the statute. *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997); *Stanford v. Maryland Police Training & Correctional Comm'n,* 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (quoting *Tidewater/Havre de Grace v. Mayor of Havre de Grace,* 337 Md. 338, 344, 653 A.2d 468, 472 (1995)); *Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Romm v. Flax,* 340 Md. 690, 693, 668 A.2d 1, 2 (1995); *Oaks,* 339 Md. at 35, 660 A.2d at 429; *Mauzy v. Hornbeck,* 285 Md. 84, 92, 400 A.2d 1091, 1096 (1979); *Board of Supervisors v. Weiss,* 217 Md. 133, 136, 141 A.2d 734 (1958). Where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute to determine legislative intent. *Marriott Employees,* 346 Md. at 445, 697 A.2d at 458; *Kaczorowski v. Mayor of Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 633 (1987); *Hunt v. Montgomery County,* 248 Md. 403, 414, 237 A.2d 35, 41 (1968).

> . . . .

This Court recently stated that "statutory language is not read in isolation, but 'in light of the full context in which [it] appear[s], and in light of external manifestations of intent or general purpose available through other evidence.'" *Stanford v. Maryland Police Training & Correctional Comm'n*, 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (alterations in original) (quoting *Cunningham v. State*, 318 Md. 182, 185, 567 A.2d 126, 127 (1989)). To this end,

[w]hen we pursue the context of statutory language, we are not limited to the words of the statute as they are printed.... We may and often must consider other "external manifestations" or "persuasive evidence," including a bill's title and function paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.

... [I]n *State v. One 1983 Chevrolet Van*, 309 Md. 327, 524 A.2d 51 (1987), ... [a]lthough we did not describe any of the statutes involved in that case as ambiguous or uncertain, we did search for legislative purpose or meaning—what Judge Orth, writing for the Court, described as "the legislative scheme." [*Id.* at] 344–45, 524 A.2d at 59. We identified that scheme or purpose after an extensive review of the context of Ch. 549, Acts of 1984, which had effected major changes in Art. 27, § 297. That context included, among other things, a bill request form, prior legislation, a legislative committee report, a bill title, related statutes and amendments to the bill. *See also Ogrinz v. James*, 309 Md. 381, 524 A.2d 77 (1987), in which we considered legislative history (a committee report) to assist in construing legislation that we did not identify as ambiguous or of uncertain meaning.

*Kaczorowski*, 309 Md. at 514–15, 525 A.2d at 632–33 (some citations omitted). [Alterations in original.]

 As we noted, *supra*, HMOs, in general, are defined in substantial measure by the nature of how they receive compensation. This characteristic of HMOs, as we have seen, has been codified in Maryland. It is apparent from the plain wording of section 19–701(f) that in Maryland, the means by which an HMO is paid for its services is an integral and limiting part of its definition. The language of this provision is clear and unambiguous and under section 9–710(b), HMOs *must* conform to that language. Pursuant to section 19–701(f)(3), HMOs are only permitted to receive compensation from their subscribers in one of three forms: co-payments, deductibles, and a pre-determined and prepaid periodic fee. When appellee asserted reimbursement and subrogation claims against appellants and collected money from their respective settlements, it was clearly being compensated in a form not provided for in section 9–710(f)(3). Compensation is defined as "recompense in value." *Black's Law Dictionary, supra,* 283; *see Tierney v. Van Arsdale,* 332 S.W.2d 546, 549 (Ky.Ct.App.1960) ("The word 'compensation' in common, general usage is broad enough to include recompense of expenses."); *Goodrich Falls Elec. Co. v. Howard,* 86 N.H. 512, 519, 171 A. 761, 765 (1934) ("Compensation is payment for value in money."). The $829.50 paid by Mr. Riemer and the $2,600.00 paid by Mr. and Mrs. Marx to appellee can be seen as nothing else than additional compensation for the health care benefits that appellee had previously provided. An HMO, by its statutory definition is limited to compensation in one of the three forms outlined in section 19–701(f)(3). A copayment is "a relatively small fixed fee required of a patient by a health insurer (as an HMO) at the time of each outpatient service or filling of a prescription." *The Merriam–Webster Dictionary* 177 (1994). A deductible is defined as "[t]he portion of an insured loss to be borne by the insured before he is entitled to recovery from the insurer." *Black's Law Dictionary, supra,* 413. A pre-determined periodic premium is a fixed payment for a specific amount of time, which is paid in advance for potential health care needs. The so-called reimbursement-subrogation manner of compensation sought by

appellee in its contract does not fall into any of these three accepted forms and the inclusion of such a provision in member contracts, which takes the arrangement out of conformance with the statute, is in violation of the Maryland HMO Act.

Further insight as to what the Legislature intended concerning compensation of HMOs can be gathered by an analysis of the Legislative history. Section 19–701 was derived from Maryland Code (1957, 1971 Repl.Vol., 1979 Cum.Supp.), Article 43, section 842. In its original wording, section 842, stated in relevant part that an HMO is

> any organization that operates or proposes to operate in Maryland, including a profit or nonprofit corporation organized under the laws of another country, state, or the District of Columbia, which:
>
> . . . .
>
> (2) Is compensated (except for any copayment or deductible arrangements) for the provision of the minimum services specified in paragraph (1) [6] of this subsection to members *solely* on a predetermined periodic rate basis. [Emphasis added.]

House Bill 200 of 1982 served as part of an ongoing revision of the Annotated Code of Maryland, specifically creating the Health–General Article. As the Bill File states, "[t]he Primary Purpose of its work is modernization and clarification, not policy making." This Court has previously addressed the general rules of construction to be applied by the courts when analyzing a general bulk revision of this nature. We said:

> It is true that a codification of previously enacted legislation, eliminating repealed laws and systematically arranging the laws by subject matter, becomes an official Code when adopted by the Legislature, and, since it constitutes the latest expression of the legislative will, it controls over all

---

6. Paragraph (1) of Article 43, section 842 mirrors the language of current section 19–703(b)(2).

previous expressions on the subject, if the Legislature so provides. However, the principle function of a Code is to reorganize the statutes and state them in simpler form. Consequently, any changes made in them by a Code are presumed to be for the purpose of clarity rather than change of meaning. Therefore, even a change in the phraseology of a statute by a codification thereof will not ordinarily modify the law, unless the change is so radical and material that the intention of the Legislature to modify the law appears unmistakably from the language of the Code.

*Welch v. Humphrey*, 200 Md. 410, 417, 90 A.2d 686, 689 (1952) (citing *Welsh v. Kuntz*, 196 Md. 86, 97, 75 A.2d 343, 347 (1950)); *see also Bureau of Mines v. George's Creek Coal & Land Co.*, 272 Md. 143, 154–55, 321 A.2d 748, 754–55 (1974); *Baltimore Tank Lines v. Public Service Comm'n*, 215 Md. 125, 127–28, 137 A.2d 187, 189 (1957). Further evidence that this change of wording was not meant to change the meaning of the statute is the wording included in the Revisor's Note to Maryland Code (1982), section 19–701 of the Health–General Article, which states that with the exception of deleting the former reference to the District of Columbia, "[t]he only other changes are in style."

The older wording included in Article 43, section 842 combined with the fact that any changes were purely for clarification or style leaves little doubt that the original intent behind this provision was to limit the nature of the compensation of entities seeking certification as health maintenance organizations. In fact, the original wording strongly demonstrates the intent of the Legislature to create a health care structure that was compensated *"solely on a predetermined periodic rate basis."* (Emphasis added.) The inclusion in former Article 43, section 842 of the parenthetical acknowledges only two exceptions to this general rule: that compensation could be accepted in the alternative forms of *only* "( . . . *copayment or deductible arrangements* )." (Emphasis added.) The words

"only" and "solely" can be interpreted no other way. To do so would run afoul of both the proper construction of the English language and the apparent intent of the Legislature.[7]

As we stated, *supra,* more insight into Legislative intent can be obtained by looking at the entire statutory scheme of Title 19, subtitle 7 of the Health–General Article. For example, section 19–702 states in relevant part:

In adopting this subtitle, the General Assembly intends to:

(1) Provide alternative methods for the delivery of health care services to residents of this State, with a view toward achieving greater efficiency and economy in providing these services;

(2) Encourage the formation of health maintenance organizations that provide health care services to subscribers or groups of subscribers *who contract for these services under a system of prepayments* .... [Emphasis added.]

Furthermore, section 19–712(a) states in relevant part:

[A] person who holds a certificate of authority to operate a health maintenance organization under this subtitle may:

. . . .

(3) Provide health care services *on a prepaid basis* through licensed providers of these services who are under

---

7. "Only" is defined as "[s]olely; merely; for no other purpose; at no other time; in no otherwise; alon[e]; of or by itself; without anything more; exclusive; nothing else or more." *Black's Law Dictionary, supra,* 1089; *see also Missouri–Kan.–Tex.R.R. Co. v. Whitaker,* 489 S.W.2d 348, 349 (Tex.Civ.App.1972) ("While, as applied to a quantity of anything [only] means so much and no more, without anything more, etc."); *Hiner v. Hugh Breeding, Inc.,* 355 P.2d 549, 551 (Okla.1960) ("The word 'only' is defined as: Alone in its class, sole, single, exclusive, solely, this and no other, nothing else or more."); *Ex parte Salhus,* 63 N.D. 238, 247 N.W. 401, 402 (1933) (" '[O]nly' means exclusively, solely, merely, for no other purpose, at no other time, in no other wise."); *Moore v. Stevens,* 90 Fla. 879, 106 So. 901, 904 (1925) (" '[O]nly' ... is synonymous with the word 'solely,' or the equivalent of the phrase 'and nothing else.' ").

contract with or employed by the health maintenance organization. [Emphasis added.]

Moreover, section 19–729 states in relevant part:

(a) *Prohibited acts.* A health maintenance organization may not:

. . . .

(8) Fail to fulfill the basic requirements to operate as a health maintenance organization as provided in § 19–710 of this subtitle.

Section 19–710(b), as we have said, requires HMOs to "conform" to the definitions. This combination of mandatory provisions emphasizes the Legislature's intent to have an HMO act as an HMO. Not only did it define mandatory characteristics of an HMO, it enacted an additional provision requiring HMOs to conform to those definitions and enacted another section demonstrating that noncompliance with the basic definition of an HMO was prohibited and subject to penalties under section 19–730 of the Health–General Article.

There are sections in subtitle 7 that create an exception to an HMO's limitation on compensation. For example, section 19–712.5, passed as an emergency measure, states in relevant part:

(e) *Payments from member or subscriber for nonemergency.*—Notwithstanding any other provision of this article, a hospital emergency facility or provider or a health maintenance organization that has reimbursed a provider may collect or attempt to collect payment from a member or subscriber for health care services provided for a medical condition that is determined not to be an emergency as defined in § 19–701(d) of this subtitle.

Evidently, the Legislature determined that an HMO may collect or attempt to collect payment, other than periodic payment, from a subscriber only in the rare situation when the HMO has paid a provider for an uncovered nonemergency service. The Legislature recognized that, absent this extraordinary circumstance, an HMO could not seek such reimbursement from a member. The entire statutory scheme empha-

sizes that an HMO, by its definitions, provides health care services on a *prepaid* basis.

Subtitle 7 of Title 19 of the Health–General Article is dedicated to the formation of Health Maintenance Organizations. It is evident from the wording included throughout this subtitle that it was the intent of the Legislature to promote health care services, which were both affordable and efficient. The Legislature viewed a system of prepayments as instrumental to achieving that goal. There is no other reason for including section 19–701(f)(3). The plain and unambiguous wording of both the old and new version of this statute clearly limits compensation to HMOs to three formats: a predetermined periodic rate basis, copayments or a deductible arrangement. The language of section 19–701(f)(3) cannot be interpreted to include payment to an HMO by means of other methods, whether subrogation, restitution, or reimbursement. The Legislature recognized this limitation on compensation: that is the rationale for the exception allowing for an alternative form of compensation in regards to the granting of emergency services and by enacting several provisions requiring conformance with the statutory definitions of an HMO and prohibiting acts inconsistent with those defining statutes. Accordingly, we hold that the trial court erred by ruling that appellee was permitted to pursue its members for subrogation, restitution, or reimbursement after they received a settlement from third-party tortfeasors. Such compensation directly contradicts the express wording of section 19–701(f)(3).

### B. Section 19–710(*o*)

In their appeal, appellants also rely on section 19–710(*o*) of the Health–General Article, which states:

(*o*) *Enrollee not liable for covered services; exceptions.*— (1) Except as provided in paragraph (3) of this subsection, *individual enrollees and subscribers of health maintenance organizations issued certificates of authority to operate in this State shall not be liable to any health care provider for any covered services* provided to the enrollee or subscriber.

(2) (i) A health care provider or any representative of a health care provider may not collect or attempt to collect from any subscriber or enrollee any money owed to the health care provider by a health maintenance organization issued a certificate of authority to operate in this State.

(ii) A health care provider or any representative of a health care provider may not maintain any action against any subscriber or enrollee to collect or attempt to collect any money owed to the health care provider by a health maintenance organization issued a certificate of authority to operate in this State.

(3) Notwithstanding any other provision of this subsection, a health care provider or representative of a health care provider may collect or attempt to collect from a subscriber or enrollee:

(i) Any copayment or coinsurance sums owed by the subscriber or enrollee to a health maintenance organization issued a certificate of authority to operate in this State for covered services provided by the health care provider; or

(ii) Any payment or charges for services not covered under the subscriber's contract. [Emphasis added.]

Similarly, section 19–710(h) provides:

(h) *Hold harmless clause.*—(1) The terms of the agreements between a health maintenance organization and providers of health services shall contain a "hold harmless" clause.

(2) The hold harmless clause shall provide that the provider may not, under any circumstances, including nonpayment of moneys due the providers by the health maintenance organization, insolvency of the health maintenance organization, or breach of the provider contract, bill, charge, collect a deposit, seek compensation, remuneration, or reimbursement from, or have any recourse against the subscriber, member, enrollee, patient, or any persons other than the health maintenance organization acting on their behalf, for services provided in accordance with the provider contract.

(3) Collection from the subscriber or member of copayments or supplemental charges in accordance with the terms of the subscriber's contract with the health maintenance organization, or charges for services not covered under the subscriber's contract, may be excluded from the hold harmless clause.

(4) Each provider contract shall state that the hold harmless clause will survive the termination of the provider contract, regardless of the cause of termination.

These sections explicitly provide that subscribers or members owe no debt to any health care provider (i.e., any doctor, hospital, etc.) for any covered services. Accordingly, except for section 19–712.5, subscribers or members cannot be primary debtors. These provisions do not directly concern the relationship between an HMO and one of its members, but they do relate to the rationale that the Legislature did not want members of HMOs to be retroactively liable for covered services. As we stated, *supra*, an HMO typically contracts with two distinct entities: its members and health care providers. While the relationship between a member, an HMO, and a provider may at first appear "to be a triangular relationship with the HMO at the apex, it is really two-sided—right (member) and left (provider) both meet at the apex (HMO) but with no contractual base line between the [member] and the provider." *Patel*, 112 Md.App. at 260–61, 684 A.2d at 909.[8]

Section 19–710(*o*) specifically concerns itself with the relationship between an HMO subscriber or member and a health care provider. It provides that a subscriber is not liable for monies owed to a health care provider by the HMO. It does not concern itself with the relationship between the member and the HMO because an HMO is not considered a health care provider. *Group Health Ass'n, Inc. v. Blumenthal*, 295 Md. 104, 110, 453 A.2d 1198, 1203 (1983) ("Under the statutory definition of [an] HMO ... it is neither a hospital nor a related institution. Consequently, it is clear from the plain

---

**8.** We do not here address any matters relating to third-party beneficiary issues.

meaning of the Health Care Malpractice Claims Act that [an] HMO, itself, is not included within the definition of health care provider.").

Section 19–710(h) requires a hold harmless clause in the contract between an HMO and its health care providers stating that a health care provider may not seek compensation, remuneration, or reimbursement from the member. Yet, in the case at bar, appellee seeks to do indirectly what providers cannot do directly. Because an HMO is a health care service, which is compensated "only" through a predetermined rate basis, copayment, or deductible arrangement, it stands to reason that the Legislature did not feel the need to address an HMO's right to pursue a member for payments for services already received: by the definition of an HMO, that type of reimbursement cannot occur.

One of the purposes of both 19–710(*o*) and 19–710(h) is consumer protection. If a member prepays the HMO for health care and receives what he or she has already paid for, a service received from a health care provider and covered by the health care contract, and the HMO does not pay the provider, the provider cannot then turn around and seek payment from the member. Under the same rationale, if a member prepays the HMO for health care and receives a service from a health care provider covered by the health care contract, and the HMO pays the provider, and then the member receives money from a third-party tortfeasor responsible for the injuries, the HMO cannot then seek payment from the member. Moreover, as we have said, the subscriber or member is not a primary debtor. He or she is not a debtor at all, but has already paid for services rendered. Upon their prepayment they, generally, have fully performed all of their financial obligations under an HMO subscriber agreement as limited by the Maryland statutes. The payment by the HMO to the health care providers is the payment of the primary debt of the HMO to the health care providers, with which the HMO separately contracts. The rationale is simple: general-

ly,[9] there is no debt owed the HMO under either contract (subscriber with HMO or HMO with health care provider).

It cannot be reasonably maintained that an HMO, in this case, appellee, even has a general right of subrogation for "paying the debt" of the third-party tortfeasor, because appellee's action in providing covered medical services did not reduce or relieve any obligations of the third-party tortfeasor. The third-party tortfeasor is liable to the injured victim for his or her damages regardless of whether the victim, an HMO, or any other insurer has paid for that medical care. *See Plank v. Summers*, 203 Md. 552, 557, 102 A.2d 262, 266–67 (1954). The member contracted with the HMO to provide health services and the HMO provided them. The fact that the member has now received additional monies from a third party does not give the HMO an avenue to go after those monies. If the Legislature took measures to protect subscribers or members from health care providers that were actually owed money by an HMO for services rendered, they plainly intended to protect members from HMOs *to whom no money was owed.*

As noted, *supra,* we can gather more insight into Legislative intent by looking at the entire statutory scheme. At the time of the occurrences here at issue, there were two sections within Title 19, subtitle 7 that discuss subrogation and reimbursement. Neither section applies to the facts of the case *sub judice.* Section 19–706.1, concerning rehabilitation or liquidation of HMOs, states in relevant part:

(h) *Certain claims of subrogation prohibited.*—(1) A health care provider may not assert a claim of subrogation against:

(i) A member of an insolvent health maintenance organization; or

---

9. In some contracts between HMOs and health care providers, there may be provisions that result in period (year) end audits, where, depending upon a provider's inability to minimize costs to the HMO, the provider may be required to return sums to the HMO. These types of provisions are not relevant to the issues before us in this case.

(ii) Against any individual, organization, or government agency which has made payments to the health maintenance organization on behalf of a member.

Section 19–706.1, like section 19–710(o), demonstrates the Legislature's continued reluctance to allow a health care provider to seek reimbursement from a member of an HMO for services provided by the HMO. The Legislature recognized that circumstances could arise where an HMO may become insolvent and unable to make payments for health care services rendered to an HMO member from a health care provider. This statute prohibits a provider from seeking compensation directly from the member. Although this statute does not specifically concern the HMO-subscriber relationship, it does support our general conclusion that the Legislature did not want a subscriber to be retroactively liable for services for which he or she has already paid a predetermined fee.

Section 19–710.2 of the Health–General Article, concerning payment to a health care provider not under a written contract, provides in relevant part:

(b) *In general.*—(1) In addition to any other provisions of this subtitle, for a covered service rendered to an enrollee of a health maintenance organization by a health care provider not under written contract with the health maintenance organization, the health maintenance organization or its agent:

(i) Shall pay the health care provider within 30 days after the receipt of a claim in accordance with the applicable provisions of this subtitle; and

(ii) Shall pay the claim submitted by:

1. A hospital at the rate approved by the Health Services Cost Review Commission; and

2. Any other health care provider at the rate billed or at the usual, customary, and reasonable rate.

(2) A health maintenance organization that pays a health care provider at the usual, customary, and reasonable rate:

(i) Except for services rendered to medical assistance recipients or for services rendered under a contract entered

into under § 1876(g) of the federal Social Security Act (42 U.S.C. § 1395mm), may not use Medicare, Medicaid, or workers' compensation payments as part of any methodology used to determine a payment at the usual, customary, and reasonable rate; and

(ii) On request of the health care provider, shall disclose the methodology used to determine the amount of payment.

(c) *Reimbursement.*—(1) A health maintenance organization may not seek reimbursement from an enrollee for any payment under subsection (b) of this section for a claim or portion of a claim submitted by a health care provider and paid by the health maintenance organization that the health maintenance organization determines is the responsibility of the enrollee.

This section demonstrates that the Legislature, in the HMO statute, has expressly limited reimbursement to this specified circumstance and circumstances relating to emergency care, *see supra.* Only if the HMO pays a provider for a service not covered by the subscriber contract, may it thereafter seek reimbursement. With these two exceptions and the one we discussed in *Roberts, infra,* under a different statute, section 15–120, everywhere reimbursement or subrogation was referenced in the Maryland Health Maintenance Organization Act at the time here at issue, the Legislature has provided strict wording that protects the HMO subscriber from the health care provider. It is apparent that the steps taken by the Legislature were designed to prevent an HMO subscriber from being retroactively liable for prepaid medical services.

Although Maryland Code (1982, 1996 Repl.Vol., 1998 Cum. Supp.), sections 19–710(o) and 19–710(h) of the Health–General Article generally do not apply to the case at bar, we note that their construction, as well as the construction of the entire article, is in congruence with the entirety of the public policy established by the Legislature in subtitle 7 of Title 19, which intends to keep the health care system in Maryland efficient and affordable by limiting compensation to HMOs to predetermined rates, copayments, or deductibles, and to pro-

tect HMO members from liability for prepaid health services already rendered. The contractual provisions for reimbursement incorporated into the subscriber's contracts are contrary to the public policy of this State, and are thus null and void.

## C. *Roberts v. Total Health Care, Inc.*

 We recently had the opportunity to address HMO subrogation rights in cases limited to services provided as part of a Medical Assistance Program. *Roberts v. Total Health Care, Inc.*, 349 Md. 499, 709 A.2d 142 (1998). Our opinion was carefully structured to apply only to the Medical Assistance Program. We relied on a specific statutory provision not applicable here in order to allow the HMO to recover under a theory of subrogation. Title 15 of the Health–General Article relates to Medical Assistance Programs *only*. It does not apply to HMOs outside the scope of Medical Assistance Programs. Accordingly, Maryland Code (1982, 1994 Repl.Vol., 1999 Cum.Supp.), section 15–120 of the Health–General Article "grants *the State* a right of subrogation to any cause of action which a program recipient has against a third party for payment of medical services." *Roberts*, 349 Md. at 503, 709 A.2d at 144. (Emphasis added). Section 15–120(a) provides that:

> If a Program recipient has a cause of action against a person, the Department shall be subrogated to that cause of action to the extent of any payments made by the Department on behalf of the Program recipient that result from the occurrence that gave rise to the cause of action.

Section 15–120 represents a portion of "the State of Maryland's effort to comply with the federal law on medical assistance, which requires states to seek reimbursement for medical assistance payments made where a third party is legally liable for that medical care." *Roberts*, 349 Md. at 504, 709 A.2d at 144.

The very existence of section 15–120 of the Health–General Article demonstrates that, even in respect to personal injury claims, subrogation is a right that the Legislature knows how to grant. This section created a statutory right of subrogation

in the State; a private health maintenance organization's right to enforce a subrogation claim pursuant to section 15–120 is based on the derivative claim that the State has a legal right to assign its statutory right to other parties. *Roberts,* 349 Md. 499, 709 A.2d 142, was premised in substantial part on the government's "strong interest in keeping its Medicaid program as efficient as possible and limited to its function of being the payor of last resort." *Roberts,* 349 Md. at 519, 709 A.2d at 152. This supports our holding that there is no general right to reimbursement or subrogation under circumstances such as exist in the case at bar.

Prior to 1981, HMOs in Medical Assistance Programs were required to "determine whether the enrollee has third-party coverage, [to] seek recovery from that source for any medical services rendered, and [to] refund the payments, excluding Medicare,. to the Department." COMAR 10.09.16.09C (1980). In 1981, COMAR was amended and HMOs that paid out medical assistance claims were permitted to keep any funds recovered from subrogation. According to the Secretary of Health and Mental Hygiene, the 1981 Amendments were made

> to achieve equity in payments to health maintenance organizations. Medical Assistance rates for these organizations are calculated on the assumption that collections from liable third parties will help defray the cost of services to Medical Assistance enrollees. To require instead that these collections be refunded to the Department is to place an undue financial burden on the organization.

8 Md. Reg. 355 (1981). The exception carved out by section 15–120 and subsequent COMAR provisions is a specific subrogation exception that applies only to HMOs when the payments are made as part of a Medical Assistance Program. The intent is to allow the State to continue to provide low cost health care to the Medical Assistance Program enrollees by keeping overall costs down. By allowing the HMO to act as an agent of the State, rates for the program are kept down. This, in turn, keeps the costs of federally funded Medicare and Medicaid programs down. Only under this set of circum-

stances has Maryland, in respect to services covered under HMO plans, allowed for subrogation for HMOs in respect to personal injury claims under circumstances based on its relationship with its subscribers. This is not the same set of circumstances as the case *sub judice*.[10]

### D. Section 11–112 of the Courts & Judicial Proceedings Article

Appellee points out 1999 Maryland Laws, Chapter 590, which became effective on October 1, 1999. The title to Chapter 590 states that it is for "the purpose of requiring that the amount for which certain persons have a right of subrogation for health care benefits or services paid or payable on behalf of an injured person be reduced by a certain amount related to the amount of attorney's fees incurred by the injured person in a personal injury claim. . . ." Chapter 590 created Maryland Code (1974, 1998 Repl.Vol., 1999 Cum. Supp.), section 11–112 of the Courts & Judicial Proceedings Article, which applies to "payors," as defined in section 19–133(k)[11] of the Health–General Article, including HMOs.

New section 11–112(b)(1) of the Courts & Judicial Proceedings Article then states that it "applies to any right of subrogation under a contract or applicable law for payment of health care benefits or services for an injured person paid or payable by a payor . . . if the amount of the subrogee's claim . . . is voluntarily paid by the injured person from the injured person's recovery in a claim for personal injury." Appellee argues that, by passing Chapter 590, "the General Assembly confirmed that . . . HMOs may, through a contractual agree-

---

**10.** In its motion for summary judgment, CMP made no effort to demonstrate that its subrogation recoveries are used to reduce premium or to argue that, as a result, the subrogation recoveries are permitted as part of the predetermined periodic rate basis under HG § 19–701(f)(3).

**11.** There was a recodification of certain sections of the Health-General Article in 1999 Maryland Laws, Chapter 702. What is now section 19–133(k) was formerly section 19–1501(h).

ment, be subrogated to their members' claims against tortfeasors."

We disagree with this interpretation. The intent behind section 11–112 does not appear to be the "confirmation" of a right of subrogation for HMOs, but to protect a plaintiff's recovery from being subjected to both the full amount of a health insurer's subrogation claim, *if they have the right to a subrogation claim,* and the insured's attorney's full fee.[12] First we note that this provision is not a part of Health-General Article, subtitle 7, "Health Maintenance Organizations." Instead it is part of the general provisions relating to "Judgments" of the Courts Article. The language of the act states that it applies to "any right of subrogation under a contract or applicable law...." This necessarily implies that it is directed to such rights that are created by *valid* contracts. More important, the purpose of the statute is not to create subrogation rights, but to limit subrogation rights that do validly exist, in such a fashion that such payments, if validly permitted, take into account the attorneys' fees and expenses of the injured party. Our review of the legislative history of the new statute confirms our belief that it was a statute designed to limit subrogation rights, not to extend them. The inclusion of the language relating to a definition in another statute that included health maintenance organizations, recognized, we suspect, that there were some persons involved in the process, who believed that such rights existed, or might exist, and were attempting to insure that if they existed, they were included in the limitations being imposed.

1999 Maryland Laws, Chapter 590 was Senate Bill 653. The genesis of this issue however was in the House of Delegates, not the Senate. The precursor to Senate Bill 653 was House Bill 91. Its precursor was House Bill 927 filed in the 1998 session, but not enacted into law. House Bill 927's precursor was House Bill 258 filed, but not enacted, in 1997.

---

12. When a subrogation claim can be made, the attorney's fee is deducted proportionately from the injured person's damage recovery and up to one-third of the subrogee's claim. *See* § 11–112(c).

As first presented, House Bill 258 purported to add a new section to the Courts Article, section 11–111. As introduced there was no reference to describing "payor" as having the same meaning as in Health General Article, section 19–1501. The bill merely provided that it applied, generally, to any right of subrogation for payment of health care benefits. It then limited any such rights as did exist. Neither the Bill Analysis nor the Fiscal Report referred to any particular entity as having specific rights to subrogation. By the third reader, the reference to "Payor" being as defined in section 19–1501(h) [13] of the Health–General Article was in the bill. The bill file contains no reference to its origin. Even at this point there was no specific reference to contractual rights. House Bill 258 was passed by the House, but never enacted.

The same proposal was introduced in 1998, House Bill 927, but failed to be enacted. Then in 1999 House Bill 91 was introduced in the House. A companion bill, Senate Bill 653 was introduced in the Senate. Most of the limited legislative history of these two bills is found in the bill file in respect to HB 91. The Bill Analysis in respect to HB 91 states that it was intended to limit rights of subrogation.

> Currently, there is no law that reduces the amount a health insurer or other payor may collect based on the percentage of the personal injury claim that the party pays for attorney's fees.
>
> . . . .
>
> The bill reduces the amount a subrogee may recover for health care benefits paid or payable [on] behalf of an insured injured person. . . .

It then noted that the bill only applied where the injured person had voluntarily paid the subrogee's claim.

This bill file also contains a recommendation for passage by the Maryland Bar Association providing, in relevant part:

> The bill reduces the amount recoverable in subrogation proportionately to the attorney's fees incurred by the in-

---

**13.** Now section 19–133(k).

jured party in pursuing the recovery of damages that led to the fund for reimbursement of the benefits paid by the insurance carrier.

In suggesting a deletion the Bar Association stated "the purpose of the proposal ... is to get more of the amount of the total recovery for the injured party, not the subrogee."

The Senate and House bill files contain identical Bill Analyses that note in their summary that:

This bill requires a reduction of the amount which may be recovered by a payor (i.e., subrogee) in a subrogation claim against an injured person for health care benefits paid or payable by a payor on behalf of the injured person....

It is clear that the purpose of the act was not to extend subrogation rights to entities that were statutorily limited to methods of compensation, HMOS, but to limit such rights that some of the entities defined as "payors" in section 19–133(k), might have. Entities such as health insurers, non-profit health service plans, and third-party administrators as defined in section 19–133(k). The Act was not intended to extend subrogation rights where none existed.

 If the Legislature assumed such a right existed for HMOs, its assumption was an erroneous one. We have held, *supra*, that, except for Medical Assistance Programs, HMOs have no right of subrogation to personal injury damages claims. In light of the current statutory scheme relating to HMOs, only a statute specifically creating a right to subrogation by HMOs or a statute removing the limitations on compensation could create a right to subrogation, contractual or otherwise.[14]

---

14. Regardless of· our interpretation of the legislation, Chapter 590, section 2 states that the new law "shall be construed only prospectively." Thus, if the Legislature was recognizing a right of medical claim subrogation for HMOs, the lack of any previous mention of such a "right" in the statutes means that it has only been legislatively recognized as of October 1, 1999, long after the alleged subrogation claims in this case were made.

## E. Subrogation in the Annotated Code of Maryland

Looking at other articles of the Maryland Code, we have noticed that the Legislature has frequently addressed the issue of subrogation. The Legislature knows how to grant a right to subrogate if it chooses to do so. As we noted in our discussion of *Roberts, supra*, Title 15 of the Health–General Article concerns Medical Assistance Programs. Besides section 15–120, subtitle 1 of Title 15 also concerns subrogation in sections 15–102.2,[15] 15–121.1, 15–121.2, and 15–121.3.[16] The existence of these statutes in comparison to the HMO statutes supports our reasoning that HMOs generally have no right to subrogation claims against subscribers and are only granted an exception, by statute, to do so under unique circumstances not present here.

The remainder of subrogation statutes outside the Health–General Article primarily deal with one of three issues: (1) special provisions for the State government, (2) commercial law, or (3) insurance. The statutes that expressly provide for subrogation for State government include: Maryland Code (1992, 1998 Repl.Vol.), section 8–410 of the Business Regulation Article,[17] Maryland Code (1984, 1999 Repl.Vol.), section 12–318 of the State Government Article,[18] and Maryland Code

---

**15.** Maryland Code (1982, 1994 Repl.Vol., 1999 Cum.Supp.), section 15–102.2 makes section 19–706.1 of the Health–General Article applicable to Managed Care Organizations in the same manner as it applies to HMOs.

**16.** Maryland Code (1982, 1994 Repl.Vol., 1999 Cum.Supp.), sections 15–120, 15–121.1, 15–121.2, and 15–121.3 all discuss Maryland's right of subrogation and right to assign subrogation claims in Medical Assistance Programs.

**17.** Subtitle 4 of Title 8 of the Business Regulation Article establishes the Home Improvement Guaranty Fund. Section 8–410(a)(1) specifically provides "[a]fter the [Maryland Home Improvement] Commission pays a claim from the Fund: (i) the Commission is subrogated to all rights of the claimant in the claim up to the amount paid."

**18.** Title 12 of the State Government Article concerns state immunity and liability. Section 12–318 grants Maryland a right of subrogation to the extent that a state "officer or employee is awarded money in an

(1957, 1996 Repl.Vol., 1999 Cum.Supp.), Article 27, section 828.[19] All three of these sections grant the State a right to recover money that it may pay out as part of a State funded program. The statutes that concern commercial law include: sections 4–407,[20] 12–309,[21] and 15–401 [22] of the Commercial Law Article. The statutes that concern insurance include: sections 9–309,[23] 9–407,[24] 19–109,[25] 19–507, 19–511,[26] 20–515, and 20–609 [27] of the Insurance Article.

---

action for false arrest, malicious prosecution, or other cause that arises from the investigation or charges."

19. Section 828 is located in the Criminal Injuries Compensation section of Article 27. Maryland Code (1957, 1996 Repl.Vol.), Article 27, section 816, spells out the intent of these provisions: "[t]he legislature finds and determines that there is a need for government financial assistance for ... victims of crime." Section 828 provides that the State is subrogated "to recover payments on account of the losses resulting from the crime with respect to which the award is made."

20. Maryland Code (1975, 1997 Repl.Vol.), section 4–407 of the Commercial Law Article recognizes a payor bank's right to subrogation on improper payment.

21. Subtitle 3 of Title 12 concerns credit provisions of consumer loans. Maryland Code (1975, 1990 Repl.Vol.), section 12–309(d) of the Commercial Law Article states that "[t]he lender is subrogated to each right and remedy which the borrower has against the seller."

22. Subtitle 4 of Title 15 of the Commercial Law Article concerns assignment of debts in debt collection. Section 15–401 of the Commercial Law Article states: "If a surety in any bond or other obligation for the payment of money or a promissory note, or the endorser of a protested draft, pays or tenders the money due on it in full, he is entitled to an assignment of it and, by virtue of the assignment, may maintain an action in his name against the principal debtor."

23. Subtitle 3 of Title 9 of the Insurance Article sets the guidelines for the Property and Casualty Insurance Guaranty Corporation. Maryland Code (1997), section 9–309(d) involves an insurer's unpaid obligation and states that "[a]n insurer may not assert a claim of subrogation against an insured of an insolvent insurer, but may assert a claim against the receiver of the insolvent insurer." This section protects "insureds" much in the way that the HMO statute protects subscribers.

24. Subtitle 4 of Title 9 of the Insurance Article is the Life and Health Insurance Guaranty Corporation Act. Section 9–407(i)(3) states that "[t]he Corporation is subrogated to the rights assigned under this subsection against the assets of the impaired insurer."

25. Title 19 of the Insurance Article concerns Property and Casualty Insurance. Subtitle 1 of this title provides us with further insight

concerning subrogation in medical expense claims. Section 19–109 states:

**§ 19–109. Subrogation of medical expense payments prohibited.**

On or after January 1, 1972, an authorized insurer *may not issue* or deliver a policy or contract of bodily injury liability insurance on a motor vehicle that is principally garaged or principally used in the State when the policy or contract is issued or delivered if:

(1) the policy or contract contains a representation that the authorized insurer will pay all reasonable medical expenses incurred for bodily injury caused by an accident to the insured or another individual covered by the policy or contract; and

(2) *the authorized insurer retains the right of subrogation to recover from a third party any amount paid under the policy or contract on behalf of the injured individual.* [Emphasis added.]

The original wording of the statute, prior to recodification in the Insurance Article, helps clarify the intent of this subsection. Maryland Code (1957, 1972 Repl.Vol.), Art. 48A, section 481B provided:

**§ 481B. Subrogation of medical payment claims prohibited.**

On or after January 1, 1972, no policy or contract of bodily injury liability insurance, which contains any representation by an insurance company that the company will pay all reasonable medical expenses incurred for bodily injury caused by accident to the insured or any relative or other person coming within the provisions thereof, shall be issued or delivered by any insurer licensed in this State upon any motor vehicle then principally garaged or principally used in this State, *if such insurer retains the right of subrogation to recover any amounts paid on behalf of an injured person under the provision of the policy from any third party.* [Emphasis added.]

This provision expressly denied a right of subrogation in insurance policies providing coverage for motor vehicle accidents that include provisions where the insurer also agrees to pay the insured's medical expenses. Pursuant to this statute, subrogation clauses in such contracts are prohibited. Additionally, in the wording of 1971 Maryland Laws, Chapter 550, the language of the bill originally applied to a "policy or contract of bodily injury liability insurance, *or of property damage liability insurance.*" (Emphasis added.) This section, combined with the fact that language extending anti-subrogation to property claims was eliminated, supports our general conclusion that the Legislature may not have wanted to extend subrogation rights to the realm of personal injury claims.

**26.** Subtitle 5 of Title 19 of the Insurance Code concerns motor vehicle insurance. Section 19–507(d) states that "[a]n insurer that provides the benefits described in § 19–505 [personal injury protection coverage] of this subtitle does not have a right of subrogation and does not have a claim against any other person or insurer to recover any benefits paid because of the alleged fault of the other person in causing or contributing to a motor vehicle accident." Section 19–511(d)(1) states that "[p]ayment as described in subsection (c) of this section shall preserve the uninsured motorist insurer's subrogation rights against the liability insurer and its insured."

**27.** Title 20 of the Insurance Article establishes the Maryland Automobile Insurance Fund. Section 20–515 concerns recovery of money owed

By looking to some of the portions of the Maryland Code we have just described, which concern themselves with subrogation, we conclude that the Legislature recognizes subrogation as a potential remedy designed to provide relief against loss and damage to a party who has paid the debt of another. But, in the Maryland HMO Act, the Legislature has limited the use of this remedy to unique factual circumstances not present here. The numerous exceptions where it does grant such a right and the fact that it does not grant such a right to HMOs in the Maryland Health Maintenance Organization Act, leads us to conclude further that the Legislature did not intend for HMOs to have general subrogation rights against members or subscribers.

## IV. Conclusion

We hold that generally, pursuant to sections 19–701(f) and 19–710(b) and (o) of the Health–General Article, and the general statutory scheme of Maryland's Health Maintenance Organization Act, an HMO may not pursue its members for restitution, reimbursement, or subrogation after the members have received damages from a third-party tortfeasor. We hold that the trial court erred on all three issues presented and, accordingly, we reverse. The trial judge also erred in not rendering a declaratory judgment. We have repeatedly noted that a declaration must be made when requested.

**JUDGMENT REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.**

---

to the Fund and expressly grants the Fund a right to subrogation from a claimant against a responsible party where the Fund has made a payment to a claimant. Section 20–609 also grants the Fund a right of subrogation "against the driver or owner of the motor vehicle by which the accident was occasioned."