766 A.2d 150

**Evelyn POTEET**

v.

**Raymond SAUTER, Jr., et al.**

**No. 2694, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Feb. 1, 2001.

Lawrence E. Ballantine (H. Barritt Peterson, Jr. & Associates, on the brief), Towson, for appellant.

Russell R. Marks (Gilbert, Marks & DiGirolamo, P.A., on the brief), Hagerstown, for appellees.

Argued before MURPHY, C.J., HOLLANDER, and KENNEY JJ.

HOLLANDER, Judge.

In this case, we must decide whether the Circuit Court for Washington County erred by failing to compel the joinder of a partially subrogated insurance company as a party plaintiff. The case arises from a serious automobile accident that occurred in Berkeley Springs, West Virginia on August 21, 1996, involving two vehicles, one driven by Evelyn Poteet, appellant, and the other by Raymond Sauter, Jr. ("Mr.Sauter"), appellee. Mr. Sauter's wife, Brenda, and two of their three children, Jan and Kasey,[1] were passengers in his car and are appellees here.

Following the motor vehicle accident, Poteet's insurance company, State Farm Mutual Automobile Insurance Company ("State Farm"), offered to settle with the Sauters for Poteet's policy limit of $50,000, but appellees refused to accept that sum. Instead, on June 2, 1998, appellees reached a settlement agreement with their own insurance carrier, State Auto Mutual Insurance Company ("State Auto"), pursuant to the underinsured motorist provision of the Sauters' policy. In accordance with the terms of the settlement, appellees received $150,000 collectively, in exchange for an assignment of rights to State Auto.

Thereafter, on August 17, 1998, appellees filed suit against Poteet in Washington County.[2] Appellant subsequently sought to join State Auto as a plaintiff, claiming the Sauters had assigned their rights against Poteet to State Auto. The court denied appellant's motion.

---

1. The child's name is spelled with a "K" in the complaint, but with a "C" in the transcript and in appellee's brief. We shall use the spelling that appears in the complaint.

2. Although the accident occurred in West Virginia, the parties reside in Maryland.

Following a three-day jury trial that began on December 1, 1999, the jury returned a verdict in favor of appellees in the amount of $308,388.83. From that verdict, appellant noted her appeal. She presents two issues for our consideration, which we have rephrased slightly:

I. Did the court err in refusing to add State Auto as a necessary party to the action?

II. Did the court err in refusing to submit the issue of contributory negligence to the jury?

We answer both questions in the negative and shall affirm.

## I. FACTUAL SUMMARY

### A. The Proceedings Below

After the accident, State Farm, Poteet's liability insurer, offered to pay the Sauters $50,000, which was the maximum per accident limit of coverage available under Poteet's policy. As we noted, the Sauters declined to accept that sum in settlement of their claim against Poteet. Instead, they pursued a claim with their own insurance company, State Auto, based on the underinsured policy provisions of their own policy, which had "a single limit" of $100,000. On June 2, 1998, in exchange for $150,000, the Sauters entered into an Agreement and Release with State Auto (the "Agreement").[3] In the Agreement, State Auto expressly refused to waive its subrogation rights against Poteet. As the terms of the Agreement are central to this case, we shall set forth below its pertinent provisions:

### AGREEMENT AND RELEASE

\* \* \*

### SECTION TWO

*Explanation*

2.01 As a result of the Occurrence, the Sauters have made a Claim against Poteet who is insured under the State

---

3. Apparently, State Farm contributed $50,000 to the settlement.

Farm Policy. State Farm has offered to pay to the Sauters the per accident limit of liability coverage ($50,000.00) under the State Farm Policy. *The Sauters have made a claim against State Auto for underinsured motorist coverage benefits provided under the State Auto Policy.* State Auto, after an examination of the land and tax records in Washington County, Maryland, has determined that Poteet is the sole owner of an unencumbered piece of real estate located in Hancock, Washington County, Maryland, which has a minimum value of $90,000.00. Therefore, *State Auto is unwilling to waive its rights of subrogation against Poteet. State Auto has agreed to pay the Settlement Amount to the Sauters in consideration for which the Sauters, pursuant to the State Auto Policy and the terms of this Agreement, will cooperate with State Auto who plans to subrogate against Poteet.*

## SECTION THREE

### Agreement

3.01 In consideration of the Settlement Amount paid by State Auto to the Sauters, the receipt and sufficiency of which is hereby acknowledged by the Sauters, the Sauters do hereby remise, release and forever discharge State Auto from (a) any and all Claims under, pursuant to or arising out of the State Auto Policy and (b) any and all Claims for Damages.

\* \* \*

3.03 The Sauters expressly agree to indemnify and hold State Auto and State Farm forever harmless against any losses sustained by State Auto and State Farm as a result of any further Claims that may hereafter or at any time be made or brought by the Sauters (or any of them) against State Auto or State Farm in connection with the Occurrence, the State Auto Policy, the State Farm Policy, or the Damages.

3.04 The Sauters agree to discharge all Liens, if any, and expressly agree to indemnify and hold State Auto and State Farm forever harmless against all Losses sustained by either of them as a result of the Sauters' failure to do so

3.05 The Sauters expressly waiver [sic], and assume the risk of, any and all Claims for Damages which exist now or which may exist in the future, but of which the Sauters are or may be unaware, whether through ignorance, oversight, error, negligence or otherwise and which, if known, would materially affect the Sauters' decision to enter into this Agreement.

3.06 The Sauters hereby irrevocably assign to State Auto their right to the per accident limit of liability coverage ($50,000.00) under the State Farm Policy. State Farm acknowledges this assignment and joins in this Agreement to evidence its consent to this assignment.

3.07 *The Sauters hereby assign to State Auto the proceeds of their Claim against Poteet and agree, pursuant to and consistent with the terms of the State Auto Policy and this Agreement, to cooperate fully with State Auto and to do all things necessary or convenient to the prosecution of State Auto's subrogation claim against Poteet including,* without limitation, travelling to the venue of the subrogation litigation, meeting with State Auto's attorneys, appearing in Court, appearing for depositions, responding to discovery, providing information, and appearing for medical evaluations.

State Auto will be responsible for the payment of all expenses related to travel and lodging for an [sic] such activity as aforesaid;

\* \* \*

3.07.02 *Sauter hereby agrees to hold in trust for the benefit of State Auto all rights of recovery against Poteet. The Sauters, subject to the provisions of Section 3.08 below, hereby assign to State Auto the proceeds of any settlement with or judgment against Poteet. The Sauters hereby*

*authorize State Auto to take any action against Poteet which may be necessary either in law or in equity, in the Sauters' own names.*

3.07.03 The Sauters warrant that they have made no settlement with, given a release to, or prosecuted any claim to judgment against Poteet, and that no such settlement will be made, no such release will be given and *no such claim will be prosecuted to judgment without State Auto's prior written consent.*

3.08 *If, as a result of State Auto's subrogation effort against Poteet, State Auto obtains and collects a verdict against Poteet for a sum which, after reduction of State Auto's legal fees and litigation expenses, is more than sufficient to fully satisfy State Auto's subrogation claim of $150,000.00, then State Auto will pay the excess jointly to the Sauters who will be solely responsible for the allocation of the excess proceeds* and who, if necessary, will seek Court approval of that allocation. Nothing in this Agreement or in this paragraph 3.08 shall be construed (a) to require State Auto to proceed with litigation against Poteet (b) to give the Sauters any control over such litigation, (c) to require consent by the Sauters to any settlement of such litigation, or (d) to require consent by the Sauters to any settlement of State Auto's Claim against Poteet prior to the initiation of litigation, all such matters being left to State Auto's sole discretion.

(Emphasis added.)

On August 17, 1998, after the Sauters settled with State Auto, suit was filed against Poteet, captioned "Raymond Sauter, Jr. and Brenda Sauter, Individually and as Parents and Next Friends and Guardians of Jan Michael Sauter and Kasey Sauter, minor children, Plaintiffs v. Evelyn F. Poteet, Defendant." Thereafter, on November 12, 1999, appellant filed a "Motion To Include A Necessary Party", pursuant to Rule 2–311 and Rule 2–211. In support of her motion, appellant said: "State Auto Insurance Company, by virtue of its claim against the proceeds of any judgment is a real party in interest and should be included in this lawsuit as a matter of law." In her

motion, Poteet pointed to State Auto's "real financial interest", based on the Agreement between State Auto and Sauter, which "entitled [State Auto] to the first $150,000 of any judgment" entered against Poteet. Appellees opposed the motion, arguing that joinder of State Auto "would tend to depress an assessment of damages against the tortfeasor", and "claiming that their injuries entitled them to compensation in excess of the amount paid by their insurer." The joinder motion was denied on November 20, 1998. The court subsequently denied a motion to reconsider.

## B. The Accident

The accident occurred at about 9:00 p.m. on August 21, 1996, at the intersection of Fairview Drive and River Road. The intersection is controlled by a stop sign that requires traffic on Fairview Drive to stop and yield the right-of-way to traffic on River Road. At the time, appellant was driving north on Fairview Drive, towards River Road, while Mr. Sauter was proceeding east on River Road in his 1986 Chevrolet Camaro. He was accompanied by his wife and two of his three children. The family had just attended a carnival in Berkeley Springs, and was on the way home. The speed limit on River Road is 55 miles per hour.

At trial, Mr. Sauter testified that he had frequently traveled on River Road and was familiar with railroad tracks located approximately 75 to 100 yards from the intersection in question. On the night of the occurrence, Mr. Sauter crossed the railroad tracks under the speed limit, at a speed of approximately 40 to 45 miles per hour. Thereafter, Mr. Sauter increased his speed approximately 5 to 8 miles per hour as he pulled away from the train tracks and progressed towards the intersection.

After Mr. Sauter crossed the tracks, he noticed Poteet's car, located approximately 100 yards from the stop sign on Fairview Road. When he first saw appellant's vehicle, Mr. Sauter said he was traveling 40–45 miles per hour. As Mr. Sauter approached the intersection, he saw the "third brake light" on the trunk lid of appellant's car, as it traveled on Fairview

Drive towards the intersection. According to Mr. Sauter, Poteet's car then "dart[ed] in front" of his vehicle. Poteet accelerated and turned left directly in front of the Sauters' vehicle. Although Mr. Sauter "hit the brakes on [his] Camaro [and] turned the wheel," swerving to the right, he could not avoid the collision, and left seventy feet of skid marks on the road.

Mr. Sauter asserted that, at the time, the weather was "clear" and he had "no problem" with visibility caused by fog. He added that his "vision" was not "impair[ed]", stating: "If you was to look up, say to look at the stars, it was just cloudy. You couldn't see stars. You know, I don't know if it's fog, clouds, or what it is but it wasn't nothing. Standing on the ground visibly looking there was no problem." Further, Mr. Sauter stated: "I didn't see actually no fog period. I didn't even know it was foggy period until I had got to the hospital. When the [ambulance] driver was trying to back into the hospital he said it was foggy. That's the only time I heard anything about fog period or seen fog."

Moreover, Mr. Sauter denied any alcohol consumption, and claimed that no alcohol was in the car at the time of the accident. That was confirmed by a blood alcohol test taken at the Washington County Hospital shortly after the accident, which was "negative". Appellant's expert, Richard Conant, M.D., acknowledged that the results of the test indicated the absence of alcohol in Mr. Sauter's system.

Jan Sauter, who was about ten years old at the time of the occurrence, also testified about the accident. He stated that, at the time of the incident, he was sitting in the back seat of the vehicle, behind his father. Nevertheless, he claimed that he could see the intersection just before the collision, and he recounted what occurred: "We just came over the train tracks and Mrs. Poteet was coming out of Fairview Drive and she just pulled out in front of us and we hit her." Although Jan saw Poteet's car slow down as she approached the stop sign, he said: "I don't know if it was to a stop because it was dark and all you could see was lights."

Deputy Sheriff Anthony Lynch was notified of the accident at 9:28 p.m. and responded to the accident scene. He testified that "visibility was not obstructed at all at the time we traveled to get to the scene." He acknowledged, however, that "there was fog setting in," and he listed the weather conditions as "foggy" on his official police report. He also recalled that the Medivac helicopter could not land because the fog was too thick.

Officer Lynch did not observe any evidence of alcohol in the Sauters' vehicle, nor was he informed that anyone had been drinking. He stated: "I would have investigated it further to see if possibly alcohol was a factor in the accident."

Appellant did not testify at trial. Nevertheless, several witnesses testified on her behalf.

Ida Berwiger testified that she and Poteet were together during the afternoon and early evening hours of August 21, 1996. Prior to the accident, Poteet drove Berwiger to her home on Fairview Avenue, which was located approximately two to two and a half miles from the intersection. Berwiger claimed that at that time it was "quite foggy" at the intersection of Fairview Drive and River Road.

Genevieve Virginia Funk, a friend of Poteet, had been out earlier that same evening. She lived about three and a half miles from the accident scene, and returned to her home located on Fairview Drive at approximately 9:30 p.m. Funk confirmed that as she drove through the intersection of Fairview Drive and River Road, the weather conditions were "very foggy." Indeed, she claimed traffic progressed very slowly on Fairview Drive because of the fog, and it took her "twice as long to get home because of the fog." Shortly after Funk returned home, she received a phone call informing her that Poteet had been in an accident. Funk immediately returned to the intersection. According to Funk, when she arrived at the scene the weather conditions were "still foggy. There was tremendous lights on and it was kind of a glow around it because of the fog."

Harry Sloan, Jr., a member of the Hancock Volunteer Fire and Rescue squad, was notified of an emergency and assisted at the scene of the accident. He testified that it took him approximately "two, three minutes at the most" to arrive at the accident scene from his home, two miles away. Sloan also stated:

> When I left my house there was no fog. When I got in several dips in ... it was all hilly ground up in that area, it was fog in the low lying area. And when I approached the accident, it was clear on the bridge and when I turned on to River Road it was clear there. As soon as I crested the hill and got right almost where the accident was, you couldn't hardly see anything. It was real foggy.

According to Sloan, he and other rescue workers moved Mr. Sauter out of his Camaro in order to have him transported to the hospital. At that time, Sloan noticed a "strong odor of alcohol" coming "from the occupant" of the Camaro, and saw several beer cans on the floor of the vehicle. Sloan acknowledged that there were about a dozen emergency personnel and two police officers at the scene, none of whom suggested any alcohol use by Mr. Sauter.

Sloan claimed that he was friends with almost everybody in Hancock, including Poteet. Although Sloan claimed that he saw appellant only a couple of times per year, he acknowledged that in 1996 he borrowed money from Poteet to buy a truck.

In an effort to rebut Funk's claims of fog and obstructed vision, appellees introduced a portion of Poteet's deposition taken on August 19, 1999. It stated, in relevant part:

> [APPELLEES' ATTORNEY]: You drove I guess what would be northward on Fairview Drive from Mrs. Berwiger's house, is that correct?

> \* \* \*

> [POTEET]: Yes.
> [APPELLEES' ATTORNEY]: You saw another pair of headlights on Fairview Drive?

[POTEET]: Uh huh.

[APPELLEE'S ATTORNEY]: Who was driving that car? Whose car was it?

[POTEET]: It was my friend and she was driving her own car with her daughter.

[APPELLEES' ATTORNEY]: What was her name? Or what is her name?

[POTEET]: Jenny Funk . . .

At the end of the trial, the court declined to instruct the jury regarding contributory negligence, despite appellant's request. The following colloquy, which preceded the jury instructions, is relevant:

[APPELLANT'S ATTORNEY]: . . . I would ask that the standard contributory negligence instruction be given.

THE COURT: I'm going to reject that. I'm not going to give a contributory negligence instruction. I don't feel even with evidence taken most favorably for you that there is any evidence of negligence by Mr. Sauter's operation of his motor vehicle.

[APPELLANT'S ATTORNEY]: Do you want me to just put my reasons on the record now?

THE COURT: Certainly.

[APPELLANT'S ATTORNEY]: Judge I think that there is sufficient evidence that the fog that night was so dense that to operate a vehicle at his testified speed of anywhere from forty-five to fifty . . . up to fifty-five mile an hour, was clearly negligent because the fog was so dense you couldn't see in front of you.

The speed is further indicated by way of the seventy feet of skid marks that were noted on Deputy Lynch's report. I think that there is sufficient evidence to show that he was negligent and that his negligence was a possible contributing factor to the accident.

I think it should be a jury question. I would except to the Court's failure to grant the contributory negligence instruction.

THE COURT: Understood. My decision is based on the causal connection and I do not feel that there is any evidence that a jury ... that a reasonable jury could find that the operation of his own injury, cause of the collision.

After the court gave its jury instructions, counsel for both sides noted their exceptions. But, appellant's counsel did not renew his objection to the court's failure to instruct the jury as to contributory negligence.

We shall include additional facts in our discussion.

## II. DISCUSSION

### A.

Appellant contends that "it is apparent" that State Auto is the real party in interest and, in light of her timely request, the court should have granted the joinder request. Poteet points to the Agreement between appellees and State Auto, in which the Sauters assigned to State Auto their right to bring a claim against Poteet, and asserts that the suit was filed "primarily to recoup the $150,000.00 payment made by State Auto." Conversely, appellees argue that they only assigned to State Auto part of the "proceeds of their claim against Poteet." Accordingly, they maintain that the court did not err in denying appellant's motion to "include" State Auto as a necessary party.

■ Resolution of the issue before us involves an analysis of the Agreement as well as the interplay of Md. Rules 2–211 and 2–201. Appellant relies on those two rule to support her claim that the court erred in denying her motion to join State Auto as a party plaintiff.[4] These rules state, in relevant part:

---

4. Preliminarily, we observe that appellees contend that Poteet has waived her right to rely on the real party in interest rule, set forth in Md. Rule 2–201, because she failed to cite that rule below. This contention shall not detain us long. Appellees are correct that appellant failed specifically to mention Rule 2–201 in the trial court, and it should have been cited. But, in the motion itself, she expressly characterized State Auto as "a real party in interest." Moreover, appellant

### Rule 2–201. Real Party in interest.

*Every action shall be prosecuted in the name of the real party in interest,* except that an executor, administrator, personal representative, guardian, bailee, trustee of an express trust, person with whom or in whose name a contract has been made for the benefit of another, receiver, trustee of a bankrupt, assignee for the benefit of creditors, or a person authorized by statute or rule may bring an action without joining the persons for whom the action is brought. When a statute so provides, an action for the use or benefit of another shall be brought in the name of the State of Maryland. No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for joinder or substitution of the real party in interest. The joinder or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

(Emphasis added).

### Rule 2–211. Required joinder of parties.

(a) **Persons to be joined.** Except as otherwise provided by law, a person who is subject to service of process shall be joined as a party in the action if in the person's absence

(1) complete relief cannot be accorded among those already parties, or

(2) disposition of the action may impair or impede the person's ability to protect a claimed interest relating to the subject of the action or may leave persons already parties subject to a substantial risk of incurring multiple or inconsistent obligations by reason of the person's claimed interest.

---

did cite Rule 2–211, the joinder rule, which is central to the disposition of this case. Further, the Court has long recognized that "substance rather than the form of the pleading is the controlling consideration." *Lapp v. Stanton,* 116 Md. 197, 199, 81 A. 675 (1911); see *Payne v. Payne,* 132 Md.App. 432, 439, 752 A.2d 1209 (2000).

In *Mid–Atlantic Power Supply Ass'n. v. Public Service Com'n,* 361 Md. 196, 221, 760 A.2d 1087 (2000), the Court recently recognized the "trend" to define real party in interest as follows:

A person entitled under the substantive law to enforce the right sued upon and who generally but not necessarily, benefits from the actions [sic] final outcome.

Speaking for this Court in *South Down Liquors v. Hayes,* 80 Md.App. 464, 564 A.2d 119 (1989), *aff'd,* 323 Md. 4, 590 A.2d 161 (1991), Judge Wilner expounded on the history of the concept of real party in interest, as well as the joinder rule. He noted that, "in its earliest derivation", the requirement to bring a civil action in the name of the real party in interest seems "to have been intended as much as an *authorization* as a requirement." *Id.* at 475, 564 A.2d 119. The Court also observed that the 1984 revisions of the Maryland Rules repealed Md. Rule 243, a mandatory provision that had previously authorized those claiming by subrogation to sue at law. *Id.* at 478–79, 564 A.2d 119. In the same year, Rule 2–211 was enacted. In the Court's view, "the repeal of Rule 243 in light of Rule 2–211 would seem rather clearly to indicate that, thenceforth, issues of required joinder would be governed by Rule 2–211 and not by Rule 2–201." *Id.* at 479, 564 A.2d 119. The Court endeavored to implement a view that gave "proper meaning" to both Rules 2–201 and 2–211. *Id.* at 480, 564 A.2d 119. Reasoning by analogy to the federal counterparts to the Maryland rules, the Court explained: " 'When there is more than one party that is a real party in interest, and one of them has bought the action, the tendency has been to take the requirement of [F.R.Civ.P] 17(a) as met, and resolve the issue as a question of joinder under [F.R.Civ.P] 19.' " *Id.* (alteration in original) (citation omitted). That approach guides us here.

## B.

The principles of subrogation are important in deciding whether State Auto is a real party in interest. Writing on

behalf of the Court of Appeals, Judge Cathell recently explained subrogation, stating:

"Subrogation is founded upon the equitable powers of the court. It is intended to provide relief against loss and damage to a meritorious creditor who has paid the debt of another. The doctrine is a legal fiction whereby an obligation extinguished by a payment made by a third person is treated as still subsisting for the benefit of this third person."

*Riemer v. Columbia Medical Plan, Inc.,* 358 Md. 222, 231, 747 A.2d 677 (2000)(quoting *Bachmann v. Glazer, Inc.,* 316 Md. 405, 412, 559 A.2d 365 (1989) (internal citations omitted). By compelling payment of a debt by one who ought to pay it, subrogation serves to " 'promote and to accomplish justice.' " *Bachmann,* 316 Md. at 413, 559 A.2d 365 (citation omitted). The "rationale" of the doctrine is to prevent unjust enrichment, as the party primarily liable on the debt is obligated to pay it. *Riemer,* 358 Md. at 231–32, 747 A.2d 677 (citations omitted). Because "a person entitled to subrogation stands in the shoes of the creditor, he is ordinarily entitled to all the remedies of the creditor, and he may use all the means which the creditor could employ to enforce payment." *Bachmann,* 316 Md. at 413, 559 A.2d 365.

In Maryland, there are three kinds of subrogation: 1) legal subrogation, arising by operation of law; 2) conventional subrogation, arising by an express or implied agreement; 3) statutory subrogation, created by an act of the Legislature. *Bachmann,* 316 Md. at 413, 559 A.2d 365; *see South Down Liquors v. Hayes,* 323 Md. at 10 n. 1, 590 A.2d 161; *Stancil v. Erie Ins. Co.,* 128 Md.App. 686, 740 A.2d 46 (1999); *Roberts v. Total Health Care, Inc.,* 109 Md.App. 635, 648, 675 A.2d 995 (1996) *aff'd,* 349 Md. 499, 709 A.2d 142 (1998). Rights arising from statutory or conventional subrogation will vary with the terms of the agreement or statutes involved. *South Down Liquors,* 323 Md. at 10 n. 1, 590 A.2d 161. Ordinarily, in the insurance context, pursuant to a contract, the subrogee insurer is subrogated to the insured, against a party who has caused the insured's loss and for which the insurer has

compensated its insured. *See generally Riemer,* 358 Md. at 231, 747 A.2d 677; *Collins v. United Pacific Ins. Co.,* 315 Md. 141, 145, 553 A.2d 707 (1989); *Roberts,* 109 Md.App. at 635, 675 A.2d 995.

 In this case, State Auto's subrogation right arose at least in part by way of an assignment to State Auto, pursuant to a contractual agreement with the Sauters.[5] This is a type of conventional subrogation. *See Bachmann,* 316 Md. at 413, 559 A.2d 365; *see also Security Insurance Co. of New Haven, v. Mangan,* 250 Md. 241, 249, 242 A.2d 482 (1968). In *Bachmann,* the Court explained: "Conventional subrogation is founded upon an agreement, express or implied, between a debtor and a third party or between a creditor and a third party that, upon payment of the debt, the third party will be entitled to all the rights and securities of that debtor or creditor." 316 Md. at 413–14, 559 A.2d 365. "Recovery on a theory of conventional subrogation is based on contract but it is nevertheless subject to principles of equity." *Id.* at 416, 559 A.2d 365.

 Partial subrogation occurs when "both the subrogor and the subrogee retain an interest in the claim." 4 James W. Moore, et al., *Moore's Federal Practice,* § 17.11[3][b] at 17–50 (3d ed.1999). As Professor Moore explains:

> [I]f the insurer satisfies his liability to the insured, but the insured sues and recovers his entire original loss, the recovery is impressed with a trust for the insurer up to the amount to which he was entitled by principles of subrogation. The insurer, therefore, owned that portion of the substantive right, and the insured owned the remainder. There are two real parties in interest . . .

3A James W. Moore, et al., *Moore's Federal Practice,* § 17.09[2. 1] at 17–78 (2d ed.1987).

---

5. Presumably, the Sauter's automobile insurance policy with State Auto also created a right of subrogation. The policy, however, is not part of the record.

■ In *South Down Liquors*, 323 Md. at 9–10, 590 A.2d 161, the Court said that because the subrogee and the subrogor were both entitled to bring a claim against the tortfeasor, both were real parties in interest. Similarly, in *United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 381, 70 S.Ct. 207, 94 L.Ed. 171 (1949), the Supreme Court explained that "if [the subrogee] has paid only part of the loss, both the insured and the insurer ... have substantive rights against the tortfeasor which qualify them as real parties in interest." It follows that if State Auto had obtained complete subrogation rights, it would have been the sole real party in interest. But, if State Auto only paid part of the Sauters' alleged loss, it only acquired partial subrogation rights. In that circumstance, the Sauters and State Auto would all qualify as real parties in interest, and either the Sauters or State Auto could bring the underlying action in their own names, as real parties in interest. See *Jefferson v. Ametek*, 86 F.R.D. 425, 427 (D.Md. 1980); *Stark v. Gripp*, 150 Md. 655, 658, 133 A. 338 (1926).

■ We conclude that State Auto had only partial subrogation rights. In analyzing whether State Auto was partially or fully subrogated, the terms of the Agreement are important. In § 3.07 of the Agreement, appellees "irrevocably assign[ed] to State Auto the *proceeds* of their Claim against Poteet...." (Emphasis Added). Further, in § 3.07.02, appellees agreed to "hold in trust" for State Auto "all rights of recovery against Poteet", and assigned "the proceeds of any settlement with or judgment against Poteet." But, they did not relinquish their right to pursue a claim against Poteet. Instead, the Sauters warranted in § 3.07.03 that "no ... claim will prosecuted to judgment without State Auto's prior written consent." The Agreement also provided that if State Auto obtained a judgment against Poteet, the Sauters would be entitled to retain from a verdict against Poteet any sum in excess of the insurer's subrogation claim of $150,000, "after reduction of State Auto's legal fees and litigation expenses ..."

In reaching our conclusion that State Auto had only partial subrogation rights, we have also considered appellant's contentions. In appellant's brief, Poteet does not argue that the terms of the Agreement foreclosed appellees' right to sue appellant. Nor does appellant claim that the assignment from the Sauters created complete subrogation rights for State Auto.[6] In this regard, it is also noteworthy that, in the proceedings below, appellant never sought to *substitute* State Auto for the Sauters. Rather, she wanted to *add* State Auto as an additional plaintiff. Therefore, as we construe appellant's argument, she recognizes that the Sauters *and* the insurer had viable claims against Poteet, and she believed that they all should have been made parties to the suit.

## C.

The question, then, is whether State Auto, as one of the real parties in interest, had to be joined as a party plaintiff. In resolving that question, appellant urges us to follow the reasoning of *Aetna Casualty*, 338 U.S. 366, 70 S.Ct. 207. In *Aetna Casualty*, the Supreme Court considered whether, under the Federal Tort Claims Act, and in light of a federal law restricting assignments of claims against the United States, an insurance company could bring suit against the United States in its own name, based on a claim to which it had become subrogated because of a payment to an insured. Three cases were involved, each presenting a varied aspect of the issue.

The Supreme Court considered whether, "[i]n cases of partial subrogation, . . . suit may be brought by the insurer alone, whether suit must be brought in the name of the insured for his own use and for the use of the insurance company, or whether all parties in interest must join in the action." *Id.* at 381, 70 S.Ct. 207. In applying F.R.Civ.P. 17(a), the federal counterpart to Md. Rule 2–201, the Court

---

**6.** Because appellant does not argue that the assignment in the Agreement served to create complete subrogation rights for State Auto, we need not consider whether the Agreement is ambiguous in this respect.

stated: "If the subrogee has paid an entire loss suffered by the insured, it is the *only* real party in interest and must sue [i]n its own name. If it has paid only part of the loss, both the insured and insurer ... have substantive rights against the tortfeasor which qualify them as real parties in interest." *Aetna Casualty,* 338 U.S. at 380–81, 70 S.Ct. 207. (Emphasis added). The Court concluded that although both the insured and the insurer had a right to sue, joinder could be compelled by the opposing party, upon timely motion. *Aetna Casualty,* 338 U.S. at 381, 70 S.Ct. 207. The Court reasoned: "The pleadings should be made to reveal and assert the actual interest of the plaintiff, and to indicate the interests of any others in the claim." *Id.; see Travelers Insurance Company v. Riggs,* 671 F.2d 810, 812–13 (4th Cir.1982) (recognizing that "the proper focus of inquiry ... is ... whether the insured has any uncompensated claim for which it may seek recovery. *If the insured does have such a claim, it is a real party in interest in whose sole name the action may be prosecuted under general principles of subrogation.")* (Emphasis added).

*Aetna Casualty* is distinguishable from the case here, because it was based on the application of federal rules that have since been revised, as well as federal statutes that are not involved in this matter. Moreover, much of what the Supreme Court discussed was *dicta.*

Although appellant does not rely on P. Niemeyer and L. Schuett, *Maryland Rules Commentary* (1992), that treatise seems to support her view as to joinder. There, the authors recognize that when an insurer pays a portion of its insured's claim, both are real parties in interest; the insurer is the real party in interest with respect to the subrogated claim, and the insured in the real party in interest as to the "remainder of the claim." *Id.* at 118. The authors add: "If only the insured brings the action, the defendant may ordinarily seek to have the insurance company made a party plaintiff as a real party in interest if the action makes claim for the subrogated amounts." *Id.*

Appellees suggest that our analysis should be governed by *South Down Liquors, Inc., supra,* 323 Md. 4, 590 A.2d 161, a "statutory subrogation" case. *Id.* at 9, 590 A.2d 161. There, as a result of an injury suffered at work by the appellee, he received workers' compensation benefits from his employer's compensation insurer. Shortly thereafter, appellee brought a third-party action against the tortfeasor, alleging negligence. Subsequently, pursuant to Maryland Rules 2–201 and 2–211, the tortfeasor asked the court to require joinder of the workers' compensation insurer as an additional party plaintiff. The court denied the motion, and the Court of Appeals affirmed.

On appeal, the Court considered "whether a defendant in a third-party action may require the involuntary joinder of the compensation insurer," *id.* at 6, 590 A.2d 161, given that both the employee and the compensation insurer had a right to bring suit against the tortfeasor. *Id.* at 9, 590 A.2d 161. In resolving that issue, the Court conducted a two-part analysis under Rules 2–201 and 2–211.

The Court first addressed "the proper application" of Rule 2–201 in a situation, as in this case, when there are two real parties in interest, "each of whom has the right to bring an action for the entire claim and only one brings the action." *Id.* at 8, 590 A.2d 161. Recognizing that neither F.R.Civ.P. 17(a) nor its Maryland counterpart, Rule 2–201, defines who is a "real party in interest", the Court considered several law review articles on the topic. Those generally defined a real party in interest as one who "has the right to bring and control the action", and not necessarily the party with a beneficial interest. *Id.* at 7, 590 A.2d 161. Moreover, the Court reviewed the history of Rule 2–201, noting that the requirement that an action be brought by the real parties in interest has been based on "statutes and rules which were permissive in nature, authorizing plaintiffs such as assignees to bring actions at law in their own names rather than in the names of the assignors." *South Down Liquors,* 323 Md. at 8, 590 A.2d 161. The Court concluded that Rule 2–201 "is satisfied when one party entitled to bring the action does so." *Id.* at 9, 590 A.2d 161. Thus, "the bringing of the action by the

employee, who is clearly a real party in interest ... satisfies the requirement of Rule 2–201." *Id.* at 10, 590 A.2d 161. Therefore, joinder of the insurer was not compelled on the basis of Rule 2–201.

The Court then analyzed Rule 2–211 to determine if joinder was required under that rule, which is derived from F.R.Civ. P.19. The Court reviewed Md.Code (1957, 1985 Repl.Vol., 1990 Supp.), Article 101, § 58, the compensation statute then in effect, which allowed an employee to pursue a claim against a third party tortfeasor, even as to damages paid by the compensation insurer. Because the statute provided a mechanism to safeguard the insurer's share of any recovery by the employee, the Court reasoned that the "entire claim is fully litigated ... and a final judgment ... will serve as a complete bar to any later claim by the insurer." *Id.* at 11, 590 A.2d 161. The Court concluded: "Joinder is not required by Rule 2–211(a) because 1) complete relief can be accorded among those already parties, and 2) disposition of the action will not impede the insurer's ability to protect its interest or subject the alleged tort-feasor ... to the risk of multiple or inconsistent obligations by reasons of the insurer's interest." *Id.* Therefore, the Court held that in an action brought by an injured employee against a third party, the defendant "may not compel the involuntary joinder of a worker's compensation insurer." *Id.*

We acknowledge that the Court in *South Down Liquors* made clear that it was addressing the joinder issue only in the workers' compensation insurance context. It said that the "question in each case will involve the nature of the claims, and the legal right of the party to bring an action for that claim." *Id.* at 10 n. 1, 590 A.2d 161. Nevertheless, we believe that the Court's reasoning is applicable in this case.

That State Auto was a real party in interest did not mean its joinder was necessarily required. Indeed, there are conflicting policy considerations with regard to joinder in a case such as this one. On the one hand, in order to minimize the award of damages, a tortfeasor defendant has an interest

in disclosing to a jury that an insurance company has compensated or will compensate a plaintiff for part of the claim of loss. Thus, Poteet argues: "Had the jury been aware that Evelyn Poteet was being sued by an insurance company and not the Sauters, the amount of their verdict [sic] may very well have been significantly less." On the other hand, a plaintiff has a countervailing interest in shielding the jury from such knowledge, so as not to jeopardize what the plaintiff hopes will be a fair and adequate recovery.

Other jurisdictions are divided on whether a subrogated insurer must be joined, given a timely request, in a suit against a tortfeasor. In *Hillworth v. Smith*, 425 Pa.Super. 17, 624 A.2d 122 (1993), for example, the Superior Court of Pennsylvania recognized the importance of avoiding the "prejudicial effect to both the insured and insurer which may result from disclosing the insurer's interest in the claim." *Id.* at 124. Based on its interpretation of the Pennsylvania Rules of Procedure, that court determined that a subrogated insurer did not have to be joined in an action brought by its insured.

Similarly, in *Catalfano v. Higgins*, 188 A.2d 357 (Del.1962), the Supreme Court of Delaware did not compel joinder of a partially subrogated insurer in an action brought by the insured against a valet company and the owner of the parking lot. After the insured received partial compensation from his insurer, he assigned his claim and vehicle title to his insurance company and then filed suit in his own name. At trial, the court granted the defense motion to dismiss the action on the ground that the insured was not a real party in interest. The appellate court rejected that ruling, stating:

'The settled policy of our Courts is to exclude from the trial of a case any mention of the fact that a Defendant is insured. The reason is too obvious to comment upon. Should the fact of insurance be revealed at trial, at the very least it would call for an instruction to the jury to disregard absolutely all evidence concerning the existence of an Insurer and, in a proper case, the Court might well take such a serious view of the matter as to order a mis-trial. Why, then, should I exercise my discretion in such an inconsistent

manner as to compel an insurance company openly to reveal itself as an interested party Plaintiff when the settled policy of our courts is just to the contrary in a case where a Defendant is insured?'

*Id.* at 359 (quoting *Steenburg v. Harry Braunstein, Inc.* 77 A.2d 206, 208 (Del.Super.1950)); *see Hoffman v. Cohen,* 538 A.2d 1096, 1102 (Del.1988) (noting that to allow an insurance company to be substituted as a party for the deceased insured would be "contrary to the long-established practice in Delaware that the existence of insurance coverage is not to be disclosed to a trier of fact."); *Chamison v. Healthtrust,* 735 A.2d 912, 918 n. 15 (Del.Ch.1999)(recognizing that an "insurer's subrogation suit must be brought in the name of the insured").

The cases that require joinder of an insurer even when the insured has not been completely reimbursed for his or her loss generally follow the reasoning set out by the Supreme Court in *Aetna Casualty.* In *Truckweld Equip. Co. v. Swenson Trucking & Excavating, Inc.,* 649 P.2d 234 (Alaska 1982), for example, the insured, Swenson Trucking & Excavating ("Swenson"), brought suit for damages to its truck caused Truckweld Equipment Company ("Truckweld"). It sought to recover the entire amount of damages, even though the insured was partially compensated by its own insurer, Insurance Company of America ("INA"). Although INA had previously attempted to pursue its subrogation interest separately, it agreed to be represented by Swenson. Prior to trial, Truckweld unsuccessfully moved to add INA as a real party in interest under state rules. At trial, a jury found in favor of Truckweld. Thereafter, Truckweld moved for costs and attorney's fees from both INA and Swenson. After Truckweld was awarded fees, Swenson appealed, and Truckweld cross-appealed. It argued that INA should have been joined and that INA was bound by the litigation.

The Alaska Supreme Court noted that those cases that have declined to follow *Aetna Casualty* "looked for a 'substantial risk' of multiple litigation as a condition of joinder." *Id.* at 237. Nonetheless, the court in *Truckweld* was concerned with

the "tyranny of the old labels" and the need to "solve each problem" that is unique to the particular case. *Id.* at 238. Additionally, it sought to avoid the use of "sham plaintiffs", *id.* at 238, and expressly rejected the notion of "abstract claims of prejudice resulting from the jury's knowledge of partial coverage ..." *Id.* at 238 n. 4. It added: "Insurance is a widely accepted fact of life." *Id.* Further, the court said:

> We think ... that Chief Justice Vinson [in *Aetna Casualty* ] articulated the proper rule in *Aetna,* and we hold that had appropriate procedures been followed, INA should have been joined. The fact that INA is bound and cannot litigate its claim a second time eliminates only one concern. The policy against use or sham plaintiffs reflected in Rule 17(a) remains unchanged. "The pleadings should be made to reveal and assert the actual interest of the plaintiff, and to indicate the interest of any others in the claim."

*Id.* at 238 (citations omitted); see *Haas v. Jefferson Nat'l Bank of Miami Beach,* 442 F.2d 394, 398 (5th Cir.1971); *Llanes v. Allstate Ins. Co.,* 136 A.2d 586, 587 (D.C.1957); *Milwaukee Insurance Co. v. McLean Trucking Co.,* 256 N.C. 721, 125 S.E.2d 25, 29 (1962) (recognizing insurer's right to subrogation based on agreement with its insured, and concluding that when " 'the insurance company has fully compensated its insured for all damages he has sustained, the insured no longer is the real party in interest ... The insurer is the real and only party interested in the result and hence the only party that can maintain the action.' ") (Citations omitted).

As we construe Rule 2–211, we are satisfied that joinder was not compelled. Significantly, it is evident that complete relief could be obtained in the case, without joining State Auto. Nor did the absence of State Auto put Poteet at risk for multiple actions arising from the accident. Moreover, because the Sauters are contractually entitled to recover any damages awarded at trial in excess of the $150,000 paid to them by the insurer, they clearly had an important interest in the proceedings, as evidenced by the verdict of $308,388.83. They were by no means sham plaintiffs. Additionally, in the event of a successful suit by the Sauters against Poteet, the terms of the

Agreement clearly provided a mechanism for recovery by the insurer from the Sauters of their $150,000.00. Thus, Poteet is not at risk for a separate, subsequent suit by State Auto, because she is protected by the doctrine of res judicata.

Res judicata is an affirmative defense that bars the relitigation of matters previously litigated between parties and their privies. *Gertz v. Anne Arundel County,* 339 Md. 261, 269, 661 A.2d 1157 (1995); *Richman v. FWB Bank,* 122 Md.App. 110, 148, 712 A.2d 41 (1998), *aff'd,* 354 Md. 472, 731 A.2d 916 (1999). It avoids " 'the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibilities of inconsistent decisions.' " *Murray Int'l Freight Corp. v. Graham,* 315 Md. 543, 547, 555 A.2d 502 (1989) (quoting *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)).

In determining whether res judicata is applicable, a court must consider:

(1) whether the parties are the same as, or in privity with, the parties to the earlier dispute;

(2) whether the cause of action presented is identical to the one determined in the prior adjudication; and,

(3) whether there was a final judgment on the merits in the initial action.

*Richman,* 122 Md.App. at 149, 712 A.2d 41; *see Chaires v. Chevy Chase Bank,* 131 Md.App. 64, 74–75, 748 A.2d 34 (2000); *Douglas v. First Sec. Federal Sav. Bank, Inc.,* 101 Md.App. 170, 181, 643 A.2d 920, *cert. denied,* 336 Md. 558, 649 A.2d 601 (1994), and *cert. denied,* 514 U.S. 1128, 115 S.Ct. 2001, 131 L.Ed.2d 1002 (1995).

" '[T]he term "parties" includes all persons who have a direct interest in the subject matter of the suit, and have a right to control the proceedings, make defense, examine the witnesses, and appeal if an appeal lies....' " *Warner v. German,* 100 Md.App. 512, 519, 642 A.2d 239 (1994) (citation

omitted). This Court has recognized that parties are in privity when,

> "in the advancement of their interest [they] take open and substantial control of its prosecution, or they are so far represented by another that their interests receive actual and efficient protection[. In that circumstance,] any judgment recovered therein is conclusive upon them to the same extent as if they had been formal parties."

*Warner* 100 Md.App. at 519, 642 A.2d 239 (citation omitted); *see FWB Bank,* 354 Md. at 498, 731 A.2d 916 (stating that " '[p]rivity in the res judicata sense generally involves a person so identified in interest with another that he represents the same legal right' ") (citation omitted); *Douglas,* 101 Md.App. at 189, 643 A.2d 920.

All of these elements would foreclose a future suit by State Auto against Poteet. Such an action would, of course, follow a final judgment on the merits in this case. Moreover, State Auto and the Sauters are in privity, and any future claim would arise from the same incident. In this regard, what we said in *Lake v. Jones,* 89 Md.App. 579, 584, 598 A.2d 858 (1991), is pertinent:

> There is no question but that [the insurer] and its [insured] were in privity. [The insurer's] claim is based upon its contractual right of subrogation to [the insured's] claim, and whether asserted by [the insured] or by her subrogated insurer on her behalf as well as its own behalf, the damages to [the insured's] automobile and the injuries to her person give rise but to a *single cause of action.*

(Emphasis added); *see Vane v. C. Hoffberger Co.,* 196 Md. 450, 454, 77 A.2d 152 (1950)(stating that "[f]or the purpose of the rule of *res judicata,* 'parties' include 'all persons who have a direct interest in the subject matter of the suit, and have a right to control the proceedings, make defense, examine the witnesses, and appeal if an appeal lies.' ") (Citation omitted).

Although not argued by appellees, we find some support for our conclusion that joinder is not compelled when we consider, by way of analogy, the collateral source rule. "Since 1899, the

collateral source rule has been applied in is State to permit an injured person to recover in tort the full amount of his provable damages regardless of the amount of compensation which the person has received for his injuries from sources unrelated to the tortfeasor." *Motor Vehicle Admin. v. Seidel,* 326 Md. 237, 253, 604 A.2d 473 (1992). The theory is that " 'a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor.' " *Id.* at 254, 604 A.2d 473 (quoting Restatement (Second) of Torts, § 920 A(2), comment b (1977)); *see Narayen v. Bailey,* 130 Md.App. 458, 466, 747 A.2d 195 (2000). The collateral source rule thus precludes a defendant from introducing evidence that a plaintiff has recovered or will recover medical expenses from his own health insurer. *Narayen,* 130 Md.App. at 466, 747 A.2d 195.

Those opposed to the collateral source rule argue that it encourages a double recovery for an insured plaintiff, and permits a tort plaintiff to recover more than his or her actual loss. *Narayen,* 130 Md.App. at 466, 747 A.2d 195. Aware of that concern and other issues, the Legislature has authorized juries in medical malpractice cases to consider collateral source evidence and, in their discretion, to reduce damages accordingly. But, significantly, they may only do so at post-verdict proceedings. *Narayen,* 130 Md.App. at 471, 747 A.2d 195; See Md.Code (1974, 1998 Repl.Vol.) §§ 3–2A–05 and 3–2A–06 of the Courts and Judicial Proceedings Article.

Here, State Auto is, in a sense, situated in a position akin to a health care insurer in an ordinary tort case, which has paid health care costs for its injured insured, and thereafter the insured lodges a suit against the tortfeasor. Although the health care insurer may have partially compensated a plaintiff for his or her medical claims and, to that extent, has a subrogation claim, the health care insurer is usually not joined in the suit as a party plaintiff. Following that logic, we do not believe the court erred by failing to compel the joinder of State Auto under the circumstances attendant here.

### D.

Appellant argues that the lower court erred by failing to instruct the jury on the issue of Mr. Sauter's contributory negligence. She argues that a jury could have found Mr. Sauter contributorily negligent if it believed that the allegedly foggy conditions should have prompted Mr. Sauter to slow down when he saw Poteet approach the stop sign. Additionally, appellant contends that the evidence indicated that Mr. Sauter may have been drinking on the evening of the accident. Relying on the Boulevard Rule, appellees counter that there was no evidence that Mr. Sauter's driving was a proximate cause of the accident, and thus the trial court properly declined to submit the issue of contributory negligence to the jury. We agree with appellees.

Preliminarily, we observe that following the jury instructions, appellant did not except to the court's failure to give the requested jury instruction on contributory negligence. Although appellees have not argued waiver on this basis, we believe appellant has failed to preserve the issue for our review. We explain.

Maryland Rule 2–520(e) states:

**Rule 2–520. Instructions to the jury.**

\* \* \*

(e) **Objections.** No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly *after* the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury.

(Emphasis added). *See Gittin v. Haught–Bingham*, 123 Md. App. 44, 49, 716 A.2d 1063 (1998)(stating that, "[i]n order to preserve his contentions concerning the law that should have governed the jury's deliberations, appellant was required to note exceptions to the trial court's jury instruction"); *Cole v.*

*Sullivan,* 110 Md.App. 79, 86, 676 A.2d 85 (1996) (concluding that appellants' exceptions did not preserve issue for review because they failed "to state distinctly the matter to which they objected and the grounds for the objection"); *Billman v. State of Md. Deposit Ins. Fund Corp.,* 88 Md.App. 79, 111, 593 A.2d 684 (1991)(stating that because no "exceptions [were] taken after the jury had been charged" the Court could not consider the alleged error in the jury instruction); *State v. Torres,* 86 Md.App. 560, 565, 587 A.2d 582 (1991) (stating that "[t]he failure to make a proper and timely objection to jury instructions will constitute a waiver of error on direct appeal in both criminal cases, and civil cases.") (Internal citations omitted).

Even if appellant's claim were preserved, we would conclude that it lacked merit. Again, we explain.

Maryland Rule 2–520(c) provides, in relevant part:

**Rule 2–520. Instructions to the jury**

\* \* \*

(c) **How given.** The court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions of its own, or by combining any of these methods. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

Upon review of a trial court's decision regarding a requested jury instruction, we must examine three aspects of the requested instruction: (1) whether the requested instruction correctly stated the law; (2) whether the proposed instruction was "applicable in light of the evidence before the jury"; and (3) whether the instructions encompassed the substance of the requested instruction. *Benik v. Hatcher,* 358 Md. 507, 519, 750 A.2d 10 (2000) (citations omitted); see *Burdette v. Rockville Crane Rental, Inc.,* 130 Md.App. 193, 212, 745 A.2d 457 (2000); *E.G. Rock, Inc. v. Danly,* 98 Md.App. 411, 420, 633 A.2d 485 (1993). The court has a duty to instruct the jury on a party's theory of the case. *Benik,* 358

Md. at 519, 750 A.2d 10; *Mallard v. Earl,* 106 Md.App. 449, 469, 665 A.2d 287 (1995).

Maryland Code (1977, 1999 Repl.Vol.), § 21–403 of the Transportation article, is relevant. It states, in part:

> **§ 21–403 Vehicle entering stop or yield intersection or through highway.**
>
> (a) *Signs authorized.*—Preferential right-of-way at an intersection may be indicated by stop signs or yield signs placed in accordance with the Maryland Vehicle Law.
>
> \* \* \*
>
> (c) *Stopping in obedience to stop signs.*—If a stop sign is placed at the entrance to an intersecting highway, even if the intersection highway is not part of a through highway, the driver of a vehicle approaching the intersecting highway shall:
>
> (1) Stop in obedience to the stop sign; and
>
> (2) Yield the right-of-way to any other vehicle approaching on the intersecting highway.

The Boulevard Rule is intended to promote the free flow of traffic on main thoroughfares by minimizing the amount of interruptions or delays and ensuring the safety of the drivers. *Brendel v. Ellis,* 129 Md.App. 309, 316, 742 A.2d 1 (1999); *Mallard,* 106 Md.App. at 458, 665 A.2d 287. This is accomplished by burdening drivers attempting to cross a major thoroughfare with a strict duty to yield the right-of-way to the driver on the favored road. *Brendel,* 129 Md.App. at 316–17, 742 A.2d 1. The driver on the favored road " 'may assume that others will obey the law and he need not anticipate their violation of the law. However, the favored driver may not proceed in complete disregard of obvious danger.' " *Mallard,* 106 Md.App. at 458, 665 A.2d 287 (quoting *Dean v. Redmiles,* 280 Md. 137, 148, 374 A.2d 329 (1977)).

In a suit by a favored driver against on unfavored driver, the unfavored driver is deemed "guilty of negligence as a matter of law in the absence of a showing of contributory

negligence on the part of the favored driver." *Mallard,* 106 Md.App. at 458, 665 A.2d 287. The issue of contributory negligence, however, is only presented to the jury when there is evidence that the favored driver was driving unlawfully and such conduct was the proximate cause of the accident. *Id.* at 457, 665 A.2d 287; *see Myers v. Bright,* 327 Md. 395, 405, 609 A.2d 1182 (1992); *Dean,* 280 Md. at 151–52, 374 A.2d 329 (stating that "the fact that the favored driver is violating the speed law does not become a jury question unless the evidence is sufficient to warrant a conclusion that the violation is a proximate cause of the injury concerning which complaint is made.").

■ In order for appellant to render the Boulevard Rule inapplicable, she must to show that Mr. Sauter, the favored driver, operated his car unlawfully and that his unlawful behavior proximately caused the accident. *See Myers,* 327 Md. at 405, 609 A.2d 1182; *Brendel,* 129 Md.App. at 316 n. 4, 742 A.2d 1; *Mallard,* 106 Md.App. at 457, 665 A.2d 287. This she failed to do.

In determining whether the court should have instructed the jury on contributory negligence, our decision in *Mallard* is instructive. There, the driver of the favored car collided with the driver of the unfavored bus. Both drivers were sued by a passenger in the favored car. At trial, a passenger in Mallard's car testified that he had been driving 35 to 40 miles per hour, and was listening to "thrash music" while the passengers were engaged in conversation. A jury ultimately found that the favored driver was negligent, and that the unfavored driver was not negligent. Mallard then appealed, claiming that the evidence was insufficient to permit the jury to consider his alleged contributory negligence. We concluded that the evidence was insufficient to justify submission of Mallard's alleged contributory negligence to the jury.

In reaching our conclusion we relied on several earlier cases, including *Sun Cab Co. v. Cusick,* 209 Md. 354, 121 A.2d 188 (1956). There, the unfavored driver claimed that the

favored driver was speeding. We quoted a portion of that case, which stated:

"[T]he driver of the taxicab had the right to assume that [an unfavored driver] would stop and yield the right of way to him ... Even though the cab may have been travelling at a rapid rate of speed, *it was the gross negligence of the [unfavored driver], and not the cab's rate of speed, that was the proximate cause of the accident. It would be mere conjecture to say that the cab might not have been struck if its rate of speed had been different.*"

*Mallard,* 106 Md.App. at 460, 665 A.2d 287 (quoting *Cusick,* 209 Md. at 360, 121 A.2d 188).

We also considered *Kopitzki v. Boyd,* 277 Md. 491, 355 A.2d 471 (1976), in which the favored driver's actions allegedly caused him to collide with an unfavored driver. The favored driver argued that, based on the Boulevard Rule, he was entitled to a directed verdict, despite evidence that he had been traveling at an excessive rate of speed. The Court held that due to the favored driver's excessive speed, the trial court properly submitted to the jury the question of whether the favored driver's speed was a proximate cause of the collision. *Id.* at 497, 355 A.2d 471. The *Mallard* Court quoted the following passage from *Kopitzki:*

"Ordinarily, in most boulevard cases, it is not material what the favored driver was doing. The accident would never have happened if the unfavored vehicle had yielded right of way, and the conduct of the unfavored driver is the sole proximate cause of the accident. But if it can be shown that the favored driver could have avoided the accident if he had been operating lawfully and with due care, then the negligence of the favored driver should be an issue for the jury."

*Mallard,* 106 Md.App. at 461, 665 A.2d 287 (quoting *Kopitzki,* 277 Md. at 496, 355 A.2d 471).

Here, the parties disputed whether fog impeded the drivers' vision. But, it was uncontroverted that Poteet made a left turn directly in front of the Sauters' vehicle, and Mr. Sauter was the favored driver. The fog may have explained Poteet's

dereliction, but there was no evidence that it caused Mr. Sauter to depart from the standard of care. Further, in light of Mr. Sauter's negative blood alcohol test and the concession of appellant's medical expert, appellees clearly refuted the testimony of the one witness who suggested that he smelled alcohol emanating from Mr. Sauter.

In sum, appellant did not produce any probative evidence showing that Mr. Sauter's driving was a proximate cause of the accident, regardless of the foggy weather. Therefore, the court did not err in failing to instruct the jury on contributory negligence.

**JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**